1
2
3              UNITED STATES DISTRICT COURT
4                   DISTRICT OF NEVADA
5                          * * *
6    ROBERT SONNY WOOD, *et al.*,              Case No. 2:17-cv-02393-MMD-DJA
7                          Plaintiffs,         ORDER
            v.
8
     NAUTILUS INSURANCE COMPANY,
9
                           Defendant.
10

11   **I.    SUMMARY**

12           This is an insurance coverage and bad faith case. Plaintiffs Robert "Sonny" Wood

13   and Access Medical LLC assert claims against Defendant Nautilus Insurance Company

14   for breach of contract, promissory estoppel, tortious breach of the implied covenant of

15   good faith and fair dealing, and violations of the Nevada Unfair Claims Practices Act.

16   (ECF No. 73.) Before the Court are Defendant's motion for summary judgment (ECF No.

17   265 ("Defendant's Motion")) and Plaintiffs' motion for partial summary judgment (ECF No.

18   301 ("Plaintiffs' Motion")).[1] For the reasons explained below, the Court will grant both

19   Motions in part, and deny both Motions in part.

20   **II.   BACKGROUND**

21           This action is third in a line of related lawsuits filed in California state court and the

22   District of Nevada. The first action was a suit (the "*Switzer* Action") brought in California

23   state court by non-party Ted Switzer against Wood and Access Medical, LLC ("Access

24   Medical"). (ECF Nos. 269-1, 269-2.) The second action was a declaratory relief action

25   (the "Coverage Action") by Nautilus Insurance Company against Wood and Access

26

27   _____

28   [1]Plaintiffs opposed Defendant's Motion (ECF No. 281) and Defendant replied (ECF
     No. 283). Defendant also opposed Plaintiffs' Motion (ECF No. 305) and Plaintiffs replied
     (ECF No. 311).

1   Medical, seeking declaratory judgment that it had no duty to defend in the *Switzer* Action,

2   nor a duty to indemnify for any subsequent damages. (ECF No. 269-8.) The information

3   that follows provides background information on those actions and how they relate to this

4   case.

5           **A.    Flournoy and Access Medical[2]**

6           At the time the *Switzer* Action was filed, Ted Switzer was the principal of several

7   LLCs which contracted with medical device companies and sold their products to

8   hospitals. (ECF No. 269-2 at 3.) One such LLC was called Omega Solutions, LLC

9   ("Omega"), at other times known as Charlie Medical, LLC. (*Id.*) Sometime around

10  December 2010, Switzer formed Flournoy Management, LLC ("Flournoy"), with Wood as

11  his partner, to sell medical implants in Tennessee and Georgia. (ECF No. 269-8 at 5.)

12  Wood became the managing member of Flournoy in May 2011. (ECF No. 269-2 at 3.)

13  Flournoy is also the sole member and manager of Epsilon Distribution I, LLC ("Epsilon").

14  (*Id.* at 3.) When Switzer and Wood formed Flournoy, Wood was also the principal of

15  Access Medical which was doing similar business in Nevada. (*Id.* at 4.)

16          **B.    The *Switzer* Action**

17          Ted Switzer filed a complaint against Flournoy and Wood in his capacity as

18  managing member of Flournoy in December 2011. (ECF No. 269-1.) The complaint

19  alleges that Wood may have mismanaged Flournoy and sought an order permitting

20  Switzer to have full and unrestricted access to inspect company materials. (*Id.* at 8.)

21  Switzer then filed a cross-complaint in the same action ("*Switzer* Cross-Complaint")

22  asserting claims against several defendants, including Wood and Access Medical

23  (collectively, the "Insureds")[3]. (ECF No. 269-2.) These claims alleged that Wood took

24

25          [2]The information provided in this section is included for background information
    only, namely to identify the relationships between the parties in the *Switzer* Action and
26  the Coverage Action. Many facts are adapted from the *Switzer* Cross-Complaint (ECF
    No. 269-2 at 3), and the Court makes no finding as to their veracity.
27

28          [3]To avoid confusion, the Court refers to Access Medical and Wood as "Insureds"
    when discussing the *Switzer* Action and the Coverage Action, and as "Plaintiffs" when
    discussing the arguments in this case.

1   income which should have been delivered to Flournoy, did not disburse the appropriate

2   amount of funds to Switzer, and paid money to Access Medical from Flournoy's accounts

3   while leaving Switzer the responsibility to reimburse Flournoy. (*Id.* at 50.)

4        The *Switzer* Cross-Complaint set forth 31 causes of action, four of which were

5   against the Insureds for "Interference with Prospective Economic Advantage." (*Id.* at 37-

6   42.) The interference with prospective economic advantage claims alleged that Wood: (1)

7   acted to disrupt the relationship between Mr. Switzer and hospital business partners by

8   his wrongful acts, and (2) that those actions resulted in injury to Switzer's personal and

9   business reputation. (*Id.*) The specific hospitals named in these claims were Alta Bates

10  Hospital (claim 13), Alameda Hospital (claim 14), Hollywood Presbyterian Hospital (claim

11  15), and Cottage Hospital (claim 16). In claim 16, involving Switzer's relationship with

12  Cottage Hospital, Switzer alleged that Flournoy had a longstanding relationship with

13  Cottage Hospital, that Wood knew of the relationship, and that Wood acted intentionally

14  and without justification acted to disrupt that relationship. (*Id.* at 42-43.) Throughout claim

15  16, Switzer refers to Wood's "wrongful acts," without clarification of what those acts were.

16  However, Switzer does state that those acts resulted in Wood "put[ting] Access in

17  Flournoy's place, and caused . . . Cottage Hospital [to cease] using Epsilon as a vendor

18  of medical implants . . . but, instead, used Access for that purpose." (*Id.* at 43.)

19        **C.    The Policy and the Initial Tender of Defense**

20        The Insureds believed that the interference with economic advantage claims were

21  covered by paragraphs 13 through 15 of the commercial insurance policy issued by

22  Nautilus to Access Medical. (ECF No. 269-3 ("Policy").) The Policy provided coverage for

23  "damages because of 'personal and advertising injury' to which this insurance applies,"

24  while disclaiming any duty to defend the insured "against any 'suit' seeking damages for

25  'personal or advertising injury' to which this insurance does not apply." (*Id.* at 13.) The

26  Policy defines "personal and advertising injury" as:

27        injury, including consequential 'bodily injury,' arising out of one or more of
        the following offenses:

28        . . .

3

> Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services[.]

(*Id.* at 22.)

The Insureds tendered the *Switzer* Cross-Complaint to Nautilus on November 14, 2013. (ECF No. 301 at 10.) Along with its tender of defense, the Insureds forwarded a July 25, 2011, email sent by Access Medical's operations manager, Jacquie Weide, to Cottage Hospital employee Deborah Fanning. (ECF Nos. 269-4 ("Weide Email"), 269-5 at 4.) In the Weide Email, Weide informed Fanning that Access Medical was interested in contracting with Cottage Hospital, and stated:

> We use Alphatec Spine products . . . I believe Dr. Early & Dr. Kahmann were using Alphatec's implants but their Distributor in the California area is now banned from selling Alphatec implants. We are in Las Vegas and have been using their products here for 2 years. Alphatec recently contacted us and asked that we take over the California region as well.

(ECF No. 269-4 at 2.)

In a letter dated May 14, 2014, Nautilus agreed to provide the Insureds with a defense against the *Switzer* Cross-Complaint under a reservation of rights. (ECF No. 269-5.) In its letter, Nautilus informed the Insureds that "[a]lthough the [*Switzer*] Cross-Complaint is entirely devoid of any allegations of covered disparagement, an email string dated 07/25/20211 was provided by your counsel as evidence that Access Medical, LLC's alleged wrongful acts could potentially include the disparagement of Ted Switzer's goods and/or services." (*Id.* at 4.) Nautilus then excerpted the Weide Email and concluded:

> To the extent that it is determined that the above referenced email constitutes conduct that triggers the duty to provide a defense under the policy, Nautilus Insurance Company agrees to participate in the defense of Access Medical, LLC and Robert Wood subject to a full and complete reservation of rights[.]

(*Id.*)

Nautilus sent a follow-up letter on October 2, 2014, reiterating its position but noting that it had discovered a potential conflict of interest. (ECF No. 269-6 at 14.) Nautilus informed the Insureds of their right to independent counsel under California law, citing California Civil Code Section 2860. (*Id.*) Nautilus proceeded to explain that it would only

1   pay "fees at rates that are actually paid by the insurer to attorneys retained by it in the

2   ordinary course of business in the defense of similar actions in the community where the

3   claim arose or is being defended." (*Id.*) The rate Nautilus agreed to pay was "$170/hour

4   for partners and $165/hour for associate attorneys." (*Id.*)

5          **D.      Nautilus' Coverage Action**

6          On February 24, 2015, Nautilus filed an action in this District seeking declaratory

7   relief that the Policy did not provide coverage in the *Switzer* Cross-Complaint.[4] (ECF No.

8   269-8 ("Coverage Action").) On January 15, 2016, Nautilus filed a motion for partial

9   summary judgment (ECF No. 269-9) in the Coverage Action, which the district court

10  granted on September 27, 2016.[5] (ECF No. 269-10.) The district court found that the

11  allegations in the *Switzer* Cross-Complaint, even when read in conjunction with the Weide

12  email, did not give rise to a potential claim for defamation, libel, or slander, and therefore

13  did not trigger Nautilus' duty to defend under the Policy. (*Id.*)

14         The Insureds moved for reconsideration, which the district court denied on May

15  18, 2017.[6] (ECF No. 269-11.) The district court reasoned:

16         The thrust of [the Insureds'] argument is that a covered claim, such as
           slander, could possibly be alleged against them in the future. I don't
17         disagree, and if that happens, then perhaps Nautilus will then have a duty
           to defend. But that does not change the fact that existing allegations
18         asserted against [the Insureds] in the [*Switzer* Action] are not covered by
           Nautilus's policy.
19

20  (*Id.* at 2-3.) In concluding that the Insureds had not shown Nautilus's duty to defend had

21  been triggered, the district court further explained:

22         [The Insureds] contend that the claims asserted against them in the [*Switzer*
           Action] could potentially include an allegation of defamation in the future, so
23         Nautilus should defend them . . . But the defect in [their] theory remains:
           there is no indication that the plaintiff in the [*Switzer* Action] has alleged that
24         the predicate wrongful act for the intentional-interference claim is a

25         [4]*Nautilus Ins. Co. v. Access Med., LLC*, Case No. 2:15-cv-00321-JAD-GWF.

26         [5]*Nautilus Ins. Co. v. Access Med., LLC*, Case No. 2:15-cv-00321-JAD-GWF, 2016
    WL 5429650 (D. Nev. Sept. 27, 2016).
27

28         [6]*Nautilus Ins. Co. v. Access Med., LLC*, Case No. 2:15-cv-00321-JAD-GWF, 2017
    WL 2193241 (D. Nev. May 18, 2017).

5

> defamatory publication that would trigger Nautilus's coverage. That the plaintiff in the state court action could theoretically add a qualifying allegation or that new evidence could surface in the future makes no matter. The duty to defend does not sprout from thin air anytime someone is sued; it exists only when the evidence and allegations given to the insurer could possibly—on their own—result in covered liability. Without any existing evidence or allegations giving rise to a potential for covered liability, there is no present duty to defend.

(*Id.* at 5-6.) Notably, the district court noted that the Insureds "offer no new evidence" that they are being sued for an act covered by the Policy. (*Id.* at 6.) The Insureds appealed to the Ninth Circuit, which affirmed the district court's ruling some two years later.[7] (ECF No. 269-34.)

Pending the appeal, Nautilus agreed to continue to defend the Insureds until the appeal's final resolution. In a letter dated November 7, 2016, Nautilus stressed that, although it would continue to provide a defense "until there is a decision on the Insureds' motion for reconsideration and appeal, if any," its actions do not in any way alter its previous reservation of rights. (ECF No. 269-12 ("November 7 Letter").) The motion for reconsideration was denied on May 18, 2017. (ECF No. 269-11.) On July 6, 2017, Nautilus informed the Insureds that it would no longer provide a defense in the *Switzer* Action effective August 1, 2017. (ECF No. 269-13 at 2.) The *Switzer* trial began August 23, 2017. (ECF No. 269-22 at 2.)

### E.    Re-Tenders for Coverage in the *Switzer* Action

While the Coverage Action was pending and after its resolution in the district court, the *Switzer* Action proceeded in California state court. Certain information which came to light during the *Switzer* Action prompted the Insureds to re-tender the defense to Nautilus for further evaluation. Specifically, that information arose from: (1) deposition testimony of Weide, Ted Switzer, and Dixie Switzer; (2) voir dire questions during jury selection in the *Switzer* trial; (3) Dixie Switzer's testimony during the *Switzer* trial; (4) Weide and Ted

---

[7]When it affirmed, the Ninth Circuit agreed with the district court's analysis of the Weide Email, reasoning "[e]ven if this email could be understood to reference Switzer, it does not contain a false statement that explicitly disparaged him and therefore did not trigger a duty to defend." *Nautilus Ins. Co. v. Access Med., LLC*, F. App'x 457 (9th Cir. 2019).

Switzer's testimony during the *Switzer* trial; and (5) jury instructions proposed by Switzer's counsel during the *Switzer* trial. Nautilus denied each re-tender, claiming that the new information did not trigger its duty to defend.

### 1.    First Re-Tender: Deposition Testimony

On July 28, 2017, the Insureds sent a letter re-tendering their request for defense to Nautilus and requesting independent counsel. (ECF No. 269-14 ("First Re-Tender").) The Insureds averred that deposition testimony of Weide, Ted Switzer, and Dixie Switzer triggered the duty to defend. (*Id.*) All three testified that Ted Switzer's contract to distribute Alphatec products was terminated by Alphatec. Ted Switzer testified that Alphatec informed him they would no longer sell to him as a distributor. (ECF No. 269-15 at 5.) Dixie Switzer confirmed this narrative, testifying that although Ted Switzer could no longer order from Alphatec, they could continue purchasing the products through Wood. (ECF No. 269-17 at 6.) Weide testified that Alphatec terminated the contract with Switzer's company, Omega, because of a Wall Street Journal article which accused Switzer of giving kickbacks. (ECF No. 269-18 at 5.) Weide further testified that Alphatec representative Rich Cuellar informed her that Alphatec would no longer work with Switzer. (*Id.* at 6.)

Nautilus denied coverage based on the new deposition testimony evidence on August 10, 2017. (ECF No. 269-19.) Specifically, Nautilus explained that the deposition transcript excerpts the Insureds provided did not "give rise to a potential claim for slander, libel or disparagement." (*Id.* at 3.) Nautilus examined Ted Switzer's deposition testimony and concluded that Weide's statement that Switzer had been banned as a distributor "was true." (*Id.* at 6.) Because there was no false statement, there could be no slander, libel, or disparagement claim. (*Id.*) Nautilus likewise denied the Insureds' request for independent counsel, concluding that because "there is no potential for coverage under the Policy, Nautilus has no duty to provide independent counsel." (*Id.* at 7.)

In addition to re-tendering the defense, the Insureds moved for relief from the judgment in the Coverage Action based on this deposition testimony. The district court

7

1   denied the motion on August 11, 2017.[8] (ECF No. 269-20.) First, the district court

2   explained that newly discovered evidence is not relevant to the Coverage Action because

3   the declaratory relief Nautilus sought was limited to "a declaration that it owned no duty

4   to defend based on the information it had at the time it filed [the Coverage Action." (*Id.* at

5   4.) Because newly discovered evidence which later did or did not trigger the duty to

6   defend would not change the district court's ruling on Nautilus's declaratory relief claim,

7   relief from the judgment was not warranted. (*Id.*) The district court further considered that

8   "this new evidence probably does not trigger Nautilus's coverage." The court further

9   reasoned:

10          Although [Switzer] suggests that [the Insureds] exaggerated in an email
            about whether he was banned from selling products, it remains unclear that
11          the statements in the [Weide Email] are false and meet the other elements
            of slander or disparagement under the applicable state law . . . [n]ot to
12          mention that nowhere in the [*Switzer* Cross-Complaint] is it alleged that [the
            Insureds] made any false statement; indeed, [the Weide Email] is not even
13          mentioned.

14   (ECF No. 269-20 at 4.)

15                  **2.      Second Re-Tender: Voir Dire During the *Switzer* Trial**

16          The Insureds again re-tendered their defense on August 24, 2017 ("Second Re-

17   Tender"), claiming that questions asked during voir dire at the trial in the *Switzer* Action

18   triggered its duty to defend. (ECF No. 269-23 at 2.) Switzer's counsel asked jurors

19   questions such as, "has anybody ever said anything about you that was false?" (ECF No.

20   269-22 at 80) and "Anybody else have an experience like that where somebody said

21   something about them that wasn't true?" (*id.* at 81). Switzer's counsel followed-up with

22   one juror who responded with "[h]as there ever been any trouble with—that your company

23   has had as far as competition, people competing with it in—in any ways that your boss

24   didn't like?", and "what I'm getting at is have you ever had any experience with the kind

25   of competition that you think might not be fair?" (*Id.* at 84.)

26   ///

27

28          [8]*Nautilus Ins. Co. v. Access Med., LLC*, Case No. 2:15-cv-00321-JAD-GWF, 2017
     WL 3484658 (D. Nev. Aug. 11, 2017).

1   Nautilus again denied coverage, claiming that questions asked during voir dire are

2   not necessarily used to educate the jury about facts of the case or to make legal

3   argument. (ECF No. 269-23 at 2.) Nautilus further explained that even if statements

4   during voir dire could be considered as evidence of Switzer's allegations in the *Switzer*

5   Action, counsel's statements did not constitute "disparagement" under California law. (*Id.*

6   at 2-3.) Because Switzer did not sue for defamation, Nautilus concluded it had no duty to

7   defend. (*Id.* at 3.) Nautilus reiterated its position, inviting the Insureds to forward "any new

8   evidence [that may] surface during the course of trial that indicates that the Insureds are

9   actually being sued for defamation by Switzer." (*Id.*)

10   ### 3.    Third Re-Tender: Dixie Switzer's Testimony

11   The Insureds again re-tendered their defense on September 19, 2017 ("Third Re-

12   Tender"), based on the trial testimony of Dixie Switzer. At trial, Dixie Switzer was

13   questioned about Theordore Switzer's termination from Alphatec. (ECF No. 269-24 at 2.)

14   When asked if Alphatec had terminated Omega's contract, Dixie Switzer answered, "We

15   continued to sell under Epsilon at Cottage Hospital from May 1st all the way through

16   August 8th; so we were not effectively banned, no." (*Id.* at 3.) In a follow up question

17   asking if Alphatec had terminated Omega's contract, Dixie Switzer responded, "But we

18   could still sell the product." (*Id.*) Wood and Access Medical considered this testimony to

19   be evidence that the Weide Email contained false statements.

20   Nautilus again rejected the defense on September 26, 2017, on three general

21   grounds. First, Nautilus stated that the testimony "does not constitute a claim of

22   disparagement sufficient to trigger coverage under the Nautilus policy." (ECF No. 269-25

23   at 2.) Nautilus's position was Dixie Switzer's testimony "does not meet the definition of

24   disparagement as defined under California law" because "her testimony does not

25   describe a statement that specifically refers to her or her business that clearly derogates

26   her business[.]" (*Id.* at 3.) Because the testimony "does not expressly refer to Ms. Weide's

27   email to Cottage Hospital," Nautilus denied coverage. (*Id.*) Second, Nautilus went further

28   to state that even if Dixie Switzer had intended to refer to the Weide Email, there still

would not be coverage because "the email does not name the distributor." (*Id.*) Third, Nautilus explained that the *Switzer* Cross-Complaint does not refer to the Weide Email nor does it contain claims for slander, libel, or defamation. (*Id.*) Neither does Switzer allege any damage to his reputation as a result of the Weide Email. (*Id.*)

Based on this reasoning, Nautilus again denied that it had a duty to defend. (*Id.*)

### 4.    Fourth Re-Tender: Weide and Switzer's Testimony

The Insureds again re-tendered the defense on September 27, 2017 ("Fourth Re-Tender"), based on trial testimony of Weide and Ted Switzer. (ECF No. 269-25 at 2.) In her testimony, Weide acknowledge that "the distributor" she referred in the Weide email was in fact Ted Switzer. (ECF No. 269-28 at 4.) Ted Switzer then testified that neither Epsilon nor Omega were ever "banned from selling Alphatec products in California." (ECF No. 269-29 at 2.) He further testified in conformity with his wife's testimony that he could still sell existing Alphatec product—and that he "already had a million dollars' worth of inventory"—after his contract was terminated with Alphatec. (*Id.* at 3.) He reiterated that he "was not banned," but rather that Wood cut him out of the deal with Cottage Hospital. (*Id.* at 3.) He did not testify about whether the Weide Email had disparaged him or otherwise caused him injury.

Nautilus rejected that Weide's testimony changed its analysis, stating that "it simply authenticates her email and evidence that Mr. Switzer was the distributor she had in mind." (ECF No. 269-31 at 4.) Neither did Ted Switzer's testimony alter Nautilus's evaluation:

> There is still no evidence that Mr. Switzer is alleging that he is suing defendants for defamation (either no its own or a [sic] part of the intentional-interference claim). Specifically, Mr. Switzer does not testify that this purported false statement that he was banned is the basis for his intentional-interference claim. Stated another way, Mr. Switzer has not state that the Weide email injured his reputation and he suffered damages due to her false statement and that is why he is suing Mr. Wood. Therefore, Nautilus still does not have a duty to defend or indemnify the Insureds in the [*Switzer*] Action.

(*Id.*) Nautilus again found it had no duty to defend. (*Id.*)

///

1          **5.      Fifth Re-Tender: Jury Instructions**

2          The Insureds re-tendered the defense again, for the final time, on October 2, 2017

3    ("Fifth Re-Tender"). (ECF No. 269-32 at 2.) This time, the Insureds referenced a proposed

4    jury instruction offered by Switzer's counsel for intentional misrepresentation.[9] (*Id.*)

5    Counsel argued the jury instruction was warranted because Wood represented he would

6    not cheat Switzer, which was purportedly false because Switzer claims Wood did "cheat"

7    him, and because of "representations that were made by Weide in all those emails"

8    counsel had previously referenced. (ECF No. 269-30 at 2-3.) It is not apparent from the

9    transcript which emails Switzer's counsel was referencing, though Defendant contends it

10   was not the Weide Email at issue in the Coverage Action.[10] (ECF No. 265 at 25.)

11         Nautilus again denied that this triggered its duty to defend, reiterating that there

12   was no evidence of a jury instruction for defamation, and likewise no asserted claim for

13   defamation. (*Id.*) Nautilus explained:

14         While the Insureds may be claiming that Mr. Wood made a false statement
           (misrepresentation), Nautilus has not been provided with any evidence that
15         Mr. Switzer is suing the Insureds for defamation, i.e. a false statement that
           clearly derogated his business and caused him damages.
16

17   (*Id.* at 3.)

18   ///

19

---

20         [9]The *Switzer* Cross-Complaint did not contain a standalone claim for intentional
     misrepresentation. The only reference to intentional misrepresentation in the *Switzer*
21   Cross-Complaint is under claim 4, breach of fiduciary duty/constructive fraud, a direct
     claim by Switzer against the Insureds. In relevant part, the claim states "As Mr. Switzer's
22   partner, Mr. Wood owed Mr. Switzer a fiduciary duty to comport himself in the highest
     good faith and in a manner consistent with the standards and duties of a trustee, binding
23   Mr. Wood to not obtain any advantage over Mr. Switzer in the partnership affairs by the
     slightest misrepresentation, concealment, threat or adverse pressure of any kind." (ECF
24   No. 269-2 at 27.)

25         [10]Nautilus refers to the list of emails sent by Weide to Switzer and another woman,
     Jean Holmes, in the *Switzer* Cross-Complaint under claim 3 for fraud. (ECF No. 269-2 at
26   22-26.) Specifically, Switzer alleged that Wood made representations to Switzer through
     Weide that Wood was performing his obligations under the partnership agreement. (*Id.* at
27   24.) Switzer alleged that these representations were false because Wood was not
     supplying half of the partnership's business, had taken business from Flournoy and kept
28   it for himself through Access Medical in Georgia, and was "stealing away customers,
     accounts and business relationships of Mr. Switzer and Epsilon in California." (*Id.*)

1

### F.    This Action

2      The Insureds, Plaintiffs Access Medical and Robert "Sonny" Wood, initiated this

3  action on August 17, 2017, in state court (ECF No. 1-1), and Defendant Nautilus

4  Insurance Company removed to this Court September 13, 2017. (ECF No. 1.) The limited

5  focus of this litigation is whether the newly discovered evidence which came to light after

6  the district court granted summary judgment in the Coverage Action would have triggered

7  a duty to defend and, if so, whether Defendant acted in bad faith by denying the re-

8  tenders. Specifically, Plaintiffs argue that Defendant had a duty to investigate the facts

9  behind the *Switzer* Cross-Complaint, that it failed to do so, and that had it properly

10  investigated, Defendant would have found that Switzer asserted claims in the *Switzer*

11  Cross-Complaint that were potentially covered under the Policy. (ECF No. 73 at 17

12  ("Second Amended Complaint" or "SAC").) As a result of Defendant's alleged failure to

13  investigate the allegations in the *Switzer* Cross-Complaint, Plaintiffs claim they suffered

14  significant damages. (*Id.* at 18.)

15  ### III.    LEGAL STANDARD

16      "The purpose of summary judgment is to avoid unnecessary trials when there is

17  no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

18  18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate

19  when the pleadings, the discovery and disclosure materials on file, and any affidavits

20  "show there is no genuine issue as to any material fact and that the movant is entitled to

21  judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue

22  is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could

23  find for the nonmoving party and a dispute is "material" if it could affect the outcome of

24  the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

25  (1986). Where reasonable minds could differ on the material facts at issue, however,

26  summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence

27  necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to

28  resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718

F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

Both parties argue they are entitled to summary judgment on all four claims in the SAC: (1) breach of contract, (2) promissory estoppel, (3) bad faith, (4) unfair claims practices. (ECF Nos. 265, 301.) Defendant additionally argues that Plaintiffs' Motion should be denied as untimely. (ECF No. 305 at 13.) As explained further below, the Court finds that Plaintiffs' untimeliness was the result of excusable neglect, Defendant's duty to defend was triggered by the First Re-Tender, Plaintiffs have failed to establish detrimental reliance on Defendant's promise, and genuine disputes of material fact exist on both the bad faith and unfair claims practices act claims. Accordingly, the Court will grant in part and deny in part both parties' Motions.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.      Timeliness of Plaintiffs' Motion

Defendant argues that Plaintiffs' Motion should be denied because it was filed more than seven months after the deadline for dispositive motions, March 15, 2021. (ECF No. 305 at 13.) Plaintiffs respond that the deadline should be 30 days after the ultimate close of discovery, which was October 4, 2021. (ECF No. 311 at 4.) While Plaintiffs' Motion is untimely, the Court will not deny the Motion based on Plaintiffs' error because Plaintiffs have otherwise shown reasonable diligence in prosecuting this action and their mistake is excusable.

### 1.      Discovery Orders and Scheduling Deadlines in this Action

The final scheduling order in this case, entered on September 15, 2020, required that dispositive motions must be filed by March 15, 2021. (ECF No. 242 at 8.) That scheduling order was the ninth extension granted. (ECF Nos. 46, 62, 68, 71, 95, 102, 123, 170, 223.) The parties stipulated to a tenth extension of discovery for another 150 days (ECF No. 254), which the Court denied on November 30, 2020 (ECF No. 255). Defendant filed its Motion on March 15, 2021. (ECF No. 265.)

On December 10, 2020, the parties stipulated to extend the expert witness disclosure deadline only (ECF No. 256), which the Court granted (ECF No. 257), extending the disclosure of expert witnesses to January 8, 2021, and rebuttal expert witnesses to February 8, 2021. Defendant then filed a motion to strike Plaintiffs' expert Stephen Strzelec (ECF No. 259), and the Court then again continued the deadline for expert disclosures to six days after it issued an order on the motion to strike (ECF No. 260). The Court denied the motion to strike on August 23, 2021 (ECF No. 295), resetting the expert disclosure deadline to August 29, 2021. The parties then stipulated to extend the discovery deadline to October 4, 2021, for the sole purpose that Defendant could depose Strzelec (ECF No. 296), which the Court granted (ECF No. 298). Nothing in the stipulation mentioned extending the deadline for dispositive motions.

///

///

### 2.    Legal Standard

"Unless the court orders otherwise, the time for filing a motion for summary judgment is governed by Fed. R. Civ. P. 56(b)." LR 7-2(b). "Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of discovery." Fed. R. Civ. P. 56(b); *see also* LR 26-1(b)(4) ("Unless the discovery plan otherwise provides and the court so orders, the deadline for filing dispositive motions is 30 days after the discovery cut-off date.").

"A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Rule 16(b)'s 'good cause' standard "primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Additionally, a court "may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* (quoting Fed. R. Civ. P. 16 Adv. Comm. Notes (1983 amendment)). However, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Id.* While a court may consider "the existence or degree of prejudice" to the opposing party as part of its decision, "the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.*

### 3.    Analysis

Plaintiffs' sole argument that its Motion is timely is that the extension of expert disclosures "should have moved the dispositive deadline until 30 days after, which would have made the deadline November 3, 2021 and the motion timely." (ECF No. 311 at 4.) Plaintiffs do not address that order granting the extension of the discovery deadline to depose Strzelec clearly stated "[n]o other deadlines shall be affected by this continuance." (ECF No. 298.) That language, coupled with the Court's earlier denial of a general extension of deadlines over a year earlier (ECF No. 255), clearly indicate that the deadline for dispositive motions had not changed. Plaintiffs' Motion is therefore untimely.

Despite its untimeliness, the Court declines to deny the Motion as untimely and will consider Plaintiffs' Motion on the merits. The circumstances indicate that that Plaintiffs

15

did believe the deadline for dispositive motions had moved with the deadline for expert testimony—Plaintiffs did not move for an extension of the deadline and proceeded to file their Motion 29 days after the close of extended discovery, as though the deadline were November 3, 2021. Moreover, the Court finds that Plaintiffs' mistake was excusable given the piecemeal amendments to the scheduling order and the uncertainty over whether their expert witness's report would be stricken. The Court finds that, on the whole, Plaintiffs have been diligent in prosecuting this matter or attempting to comply with deadlines, and that this mistake does not constitute "carelessness." There is also no indication that Defendant has been prejudiced by the delay of Plaintiffs' Motion, especially because most of the arguments mirror those in its own Motion. Finally, given the protracted nature of this case, the Court finds it is more expedient to evaluate both parties' Motions on the merits. For these reasons, the Court finds there is good cause to permit Plaintiffs' late-filed Motion. Consequently, the Court denies Defendant's request for sanctions.

### B.    Breach of Contractual Duty to Defend

Plaintiffs' first claim in the SAC alleges that Defendant breached their contractual agreement under the Policy by (1) failing to properly investigate the claims in the *Switzer* Cross-Complaint, (2) refusing to defend them in the *Switzer* Action despite having a duty to do so, and (3) refusing to settle claims in the *Switzer* Action while Defendant was defending Plaintiffs, (4) requiring Plaintiffs to pay for independent counsel in the *Switzer* Action, (5) denying defense to Plaintiffs on the eve of the *Switzer* Action trial, and (6) refusing to provide a defense to Plaintiffs during their appeal of the *Switzer* Action. (ECF No. 73 at 19.)

Defendant argues that none of the new evidence supplied with the re-tenders triggered its duty to defend Plaintiffs under the Policy, and therefore no contractual breach occurred. (ECF No. 265 at 18.) Plaintiffs counter that because the re-tenders showed that the Weide Email contained a false statement, Defendant's duty to defend was triggered

1  because there was at least the potential for coverage under the Policy. (ECF Nos. 281 at
2  24, 301 at 24.) As explained further below, the Court agrees with Plaintiffs.

3                  **1.**    **Legal Standard**

4        "An insurance policy [typically] creates two contractual duties between the insurer
5  and the insured: the duty to indemnify and the duty to defend." *Nautilus Ins. Co. v. Access*
6  *Med., LLC*, 482 P.3d 683, 687 (Nev. 2021) (quoting *Century Sur. Co. v. Andrew*, 432 P.3d
7  180, 183 (Nev. 2018)). "The duty to defend is broader than the duty to indemnify." *United*
8  *Nat'l Ins. Co. v. Frontier Ins. Co., Inc.*, 99 P.3d 1153, 1158 (Nev. 2004). "[A]n insurer's
9  duty to defend is triggered whenever the potential for indemnification arises, and it
10  continues until this potential for indemnification ceases." *Benchmark Ins. Co. v. Sparks*,
11  254 P.3d 617, 621 (Nev. 2011). "There is a potential for indemnification when the
12  allegations in the third party's complaint show that there is 'arguable or possible
13  coverage,' or when the insurer 'ascertains facts which give rise to the potential of liability
14  under the policy.'" *Nautilus*, 482 P.3d at 687-88 (quoting *United Nat'l*, 99 P.3d at 1158,
15  and *Century Sur.*, 432 P.3d at 183). "If there is any doubt about whether the duty to defend
16  arises, this doubt must be resolved in favor of the insured." *Id.* at 1158. Courts construe
17  the duty to defend so broadly "to prevent an insurer from evading its obligation to provide
18  a defense for an insured without at least investigating the facts behind the complaint." *Id.*

19        But the insurer's duty to defend "is not absolute." *Nautilus*, 482 P.3d at 688 (quoting
20  *United Nat'l*, 99 P.3d at 1158). "A potential for coverage only exists when there is arguable
21  or possible coverage." *United Nat'l*, 99 P.3d at 1158. "If neither the allegations of the
22  complaint nor the facts known to the insurer show any possibility of coverage, then there
23  is no duty to defend." *Nautilus Ins. Co.*, 482 P.3d at 688.

24                  **2.**    **Analysis**

25        The Policy mandates the duty to defend against any lawsuit seeking damages
26  "because of 'personal and advertising injury.'" (ECF No. 269-3 at 13.) Such an injury is
27  defined by the Policy as injury "arising out of . . . [o]ral or written publication, in any
28  manner, of material that slanders or libels a person or organization or disparages a

person's or organization's goods, products, or services." (*Id.* at 22.) Defendant clearly interpreted this clause to mean that unless a complaint facially states a claim for slander, libel, or disparagement, the duty to defend is not triggered.[11] Defendant maintains first that the interference with prospective economic advantage claims do not qualify as disparagement, and second that unless a qualifying claim is raised, no duty to defend exists.

The Court finds Defendant's reading of the Policy is too narrow under Nevada law. Because overlapping questions were litigated extensively in the Coverage Action, the Court will first address the scope and effect of the district court's rulings. Next, the Court interprets the Policy language to determine the extent of the relevant provisions' coverage. Finally, the Court considers whether the newly presented evidence triggered the duty to defend under the Policy. Because the Court finds that it did, the Court will deny Defendant's Motion.

### a.    The Scope and Effect of the Coverage Action Judgment

In the Coverage Action, the district court found "the complaint does not contain claims for slander, libel, or defamation or allege that defendants made any false statements about Switzer or his businesses." (ECF No. 269-10 at 7.) The district court noted that the Weide Email "does not name the banned distributor"[12] and that "Switzer does not reference the e-mail in his cross-complaint." (*Id.* at 8.) Considering both the *Switzer* Cross-Complaint and the Weide Email, the district court applied California law and reasoned that the elements of disparagement were not met. (*Id.* at 9-10.) A disparagement claim requires that the defendant make "[a] false or misleading statement [that] (1) specifically refers to the plaintiff's product or business and (2) clearly derogates

---

[11]Defendant elides these three claims into "defamation" at various points.

[12]There does not appear to have ever been any real dispute that Weide was referencing Switzer or that any of the parties were confused by the reference. However, the district court noted in the summary judgment order that Weide declared she meant Switzer (ECF No. 269-10 at 8 n.35), so it was known to Defendant at least by September 27, 2016, before the First Re-Tender which took place in 2017.

that product or business. Each requirement must be satisfied by express mention or clear implication." *Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 326 P.3d 253, 291 (Cal. 2014). The district court concluded that the *Switzer* Cross-Complaint, even when read in conjunction with the Weide Email, did not give rise to a potential claim for slander, libel, or disparagement, because the Insureds had not offered any facts to show that the Weide Email contained a false statement.[13] (ECF No. 269-10 at 10.) Indeed, the district court went so far as to distinguish an analogous case by reasoning that "Switzer does not base his intentional-interference claims on allegations of defamation." (*Id.* at 11.)

As reflected in the district court's own express holding, its decision was limited to the declaratory relief Nautilus sought—"a declaration that the insurer had no coverage based on the evidence it had *when it filed this case.*"[14] (ECF No. 269-20 at 2.) The district court further explained:

> Nautilus's complaint sought a declaration that it owed no duty to defend based on the information it had at the time it filed this case. It did not seek a declaration about whether it might owe a duty to defend in the future— such as if it were presented with new evidence that triggers coverage under its policy. And that is what my prior orders say: Nautilus owed no duty because there were not yet any allegations or evidence triggering coverage.

(ECF No. 269-20 at 4.) In the Reconsideration Order, the district court explained the deficiency in the Insureds' argument—"there is no indication that [Switzer] has alleged that the predicate wrongful act for the intentional-interference claim is a defamatory publication that would trigger Nautilus's coverage." (ECF No. 269-11 at 5.) The district

---

[13]The district court further reasoned that the *Switzer* Cross-Complaint did not include any allegation that the Insureds made false statements in an effort to tortiously interfere with Switzer's business relationships. However, under California law, "a plaintiff need not plead that the defendant acted with specific intent to interfere with the plaintiff's business expectancy" when asserting a claim for intentional interference with prospective economic advantage. *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 958 (Cal. 2003). Accordingly, the absence of an allegation is not fatal to the claim, nor does it indicate that Switzer would not later so allege.

[14]The district court further explained: "The biggest problem with [the Insureds'] theory is procedural. Nautilus's complaint sought a declaration that it owed no duty to defend based on the information it had at the time it filed this case. It did not seek a declaration about whether it might owe a duty to defend in the future—such as if it were presented with new evidence that triggers coverage under its policy." (ECF No. 269-20 at 4.)

court reasoned further that should the allegations against the Insureds change during the course of litigation, "perhaps Nautilus will then have a duty to defend." (ECF No. 269-11 at 2.)

The question of whether newly tendered evidence may trigger the duty to defend later in the litigation therefore remained open. Although the district court remained skeptical that the deposition testimony would have triggered the duty to defend, it expressly did not reach that question on the merits, nor did it consider any further evidence provided in the subsequent re-tenders. (ECF No. 269-20 at 4.) Moreover, the district court did not provide a final determination on the meaning of the relevant Policy language. The district court concluded there was no duty to defend because there was not a claim (or possibility of a claim) for slander, libel, or defamation at the time Nautilus submitted the Coverage Action. (ECF No. 269-10 at 9.) The district court did not, however, make a final determination about the meaning of the language in the personal and advertising injury provision of the Policy. Accordingly, another open question remains: whether Nautilus's duty to defend the Insureds would be triggered if, and only if, Switzer amended the *Switzer* Cross-Complaint to assert a claim for defamation.

### b.   Relevant Policy Provisions

Because insurance policies are contracts of adhesion, "the language of an insurance policy is broadly interpreted in order to afford 'the greatest possible coverage to the insured.'" *United Nat'l*, 99 P.3d at 1156 (quoting *Farmers Ins. Grp. v. Stonik*, 867 P.2d 389, 391 (Nev. 1994)). Coverage is only restricted "if the policy's language 'clearly and distinctly communicates to the insured the nature of the limitation.'" *Id.* (quoting *Vitale v. Jefferson Ins. Co.*, 5 P.3d 1054, 1057 (Nev. 2000)). "[A]ny ambiguity or uncertainty in an insurance policy must be construed against the insurer and in favor of the insured." *Vitale*, 5 P.3d at 1057. When courts interpret an insurance policy, its language "will be given its plain and ordinary meaning 'from the viewpoint of one not trained in law.'" *United Nat'l*, 99 P.3d at 1156-57 (quoting *Vitale*, 5 P.3d at 1057).

///

20

The Policy covers "Personal and Advertising Injury Liability." (ECF No. 269-3 at 13.) In relevant part, Defendant agreed that:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

(*Id.*)

The Policy defines 'suit' as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' or 'personal and advertising injury' to which this insurance applies are alleged." (*Id.* at 23.) 'Personal and advertising injury' is defined as:

> injury . . . arising out of one or more of the following offenses:
> . . .
> d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]

(*Id.* at 22.) The terms 'offenses,' 'publication,' 'slanders,' 'libels,' and 'disparages' are not defined by the Policy.

The Court first construes the definition of 'personal and advertising injury.' Plaintiffs argue, and Defendant does not contest, that these claims carry their ordinary rather than their legal meanings. (ECF No. 301 at 23.) The terms in the definition of personal or advertising injury are ambiguous because they may refer to legal claims or, alternatively, may convey their colloquial meaning. References in the definition to 'slander,' 'libel,' and 'disparagement' therefore could signal that these injuries are meant to be legal claims, but conversely may mean that "disparage[ing] a person's or organizations goods, products, or services" as it commonly understood is sufficient to constitute an 'offense.' (*Id.* at 22.) Because the Court is required to interpret language in an insurance policy with its "plain and ordinary meaning" and "from the viewpoint of one not trained in law," the language cannot be assumed to carry its legal definitions. *See United Nat'l*, 99 P.3d at 1156-57.

21

Next, the phrase "injury . . . arising out of one or more of the following offenses" is also ambiguous. It is unclear how closely the 'injury' is linked to the offending 'publication.' The language could mean only injuries that are directly caused by the 'offense,' limiting the meaning to claims for slander, libel, or disparagement. Conversely, the phrase could mean that coverage is triggered by injuries that result from slanderous, libelous, or disparaging publications, including claims that may be more removed from the publication itself. The Court is obligated to construe the language to the advantage of the insured. *See Vitale*, 5 P.3d at 1057. Taken in tandem with the ordinary definition of the terms 'slander,' 'libel,' and 'disparagement,' the Court concludes that 'personal and advertising injury' coverage does not require an expressly pleaded common-law or statutory slander, libel, or disparagement claim.[15] Instead, coverage may apply whenever an injury arises from an offending publication and the injured party seeks damages in a civil suit.

### c.   Newly Discovered Evidence

The Court now turns to the evidence proffered with the re-tenders. Because the Court finds the newly discovered evidence raised the potential for coverage under the personal and advertising injury provision, Nautilus's duty to defend was triggered. Defendant therefore breached their duty under the Policy when it withdrew its defense and subsequently denied the re-tenders.

As explained above, the district court found in the Coverage Action that Nautilus had no duty to defend because the Insureds had failed to offer any facts that the Weide Email contained a false statement. Because the statement was not false, the district court reasoned, there could be no potential for coverage, as no publications were slanderous,

---

[15]Indeed, Defendant does not clearly argue that the Policy requires a defamatory claim—slander, libel, or disparagement—to be expressly pleaded for coverage to apply. In its Motion, Defendant denies that the new evidence triggered the duty to defend because it "does not assert disparagement, either expressly or impliedly, and such assertions are required to trigger coverage under the Policy." (ECF No. 265 at 21.) But even if Defendant were to argue that the Policy's coverage is triggered only when defamatory claims pleaded in a civil complaint, the Court would disagree for the reasons explained in this section.

1    libelous, or disparaging. If a false statement came to light, however, the potential for

2    coverage may be triggered.

3        The First-Retender triggered the potential for coverage. Ted Switzer testified at his

4    deposition that Alphatec terminated his contract, but that he could continue to sell

5    Alphatec product through his partner. (ECF No. 269-15 at 6.) Dixie Switzer similarly

6    testified that they "could still buy the products and still keep the business through Sonny

7    [Wood]." (ECF No. 269-17 at 6.) Weide testified that "Alphatec had cancelled Omega's

8    contract . . . [and] would no longer work with Mr. Switzer." (ECF No. 269-18 at 5.) All three

9    representations differ from the content of the Weide Email, which told Cottage Hospital

10   that "[the doctors'] Distributor in the California area is now banned from selling Alphatec

11   implants." (ECF No. 269-4 at 2.)

12       At the time Plaintiffs submitted the First Re-Tender, July 28, 2017, Defendant was

13   on notice that the Weide Email may have contained a false statement. There was a

14   discrepancy between the representation made to Cottage Hospital and the deposition

15   testimony provided by Ted Switzer, Dixie Switzer, and Weide. The Weide Email suggests

16   that the former distributor, Switzer, is not permitted to continue to sell Alphatec product to

17   hospitals, and that Cottage Hospital would therefore need to find a new distributor. The

18   deposition testimony states to the contrary that Switzer could continue to sell the Alphatec

19   inventory to hospitals, but that his contract with Alphatec had been terminated and he

20   could no longer purchase inventory from Alphatec. Despite this, Defendant concluded

21   that "the deposition testimony of Mr. Switzer confirms that Weide's statement that a

22   former distributor was banned by Alphatec, was true," and therefore no possibility existed

23   that a 'personal and advertising injury' had arisen. (ECF No. 269-19 at 6.) But at this point

24   in time, there was a clear indication that the material in the Weide Email was false, and

25   accordingly there was a potential for coverage under the Policy.

26       It bears repeating that the duty to defend is broader than the duty to indemnify.

27   *See United Nat'l*, 99 P.3d at 1158. It may well be the case that the possibility of liability

28   under the Policy was slim, or that ultimately coverage would not exist. That does not

change Defendant's duty to defend its insured until such time as any potential for liability ceases. *See Benchmark*, 254 P.3d at 621. Because Defendant withdrew its defense effective August 1, 2017 (ECF No. 269-13), despite receiving information from Plaintiffs on July 28, 2017, that triggered the duty to defend (ECF No. 269-14), Defendant breached its contractual duty under the Policy.[16]

### C.  Breach of Duty to Pay Reasonable Costs for Independent Counsel

A subset of Plaintiffs' breach of contract claim is their argument that Defendant failed to pay independent counsel a reasonable rate. (ECF No. 73 at 19.) Plaintiffs argue that Defendant impermissibly used a more restrictive California rule to limit fees for independent counsel, resulting in Plaintiffs having to pay the balance. (ECF No. 301 at 25.) Defendant does not directly respond to this claim, other than to say that issues relating to coverage for retention of independent counsel "are irrelevant to this action" because "the issues in this case are limited to the 'new evidence' and the Insureds' promissory estoppel claim." (ECF No. 305 at 18.) As explained below, the Court disagrees with Defendant, but further finds that Plaintiffs have failed to establish they are entitled to summary judgment on this claim.

### 1.  Legal Standard

Both Nevada and California are dual-representation states, meaning insurer-appointed counsel represents both the insurer and the insured. *State Farm Mut. Auto. Ins. Co. v. Hansen*, 357 P.3d 338, 340 (Nev. 2015) (citing *Nev. Yellow Cab Corp. v. Eighth Judicial Dist. Ct.*, 152 P.3d 737, 742 (Nev. 2007), and *Unigard Ins. Grp. v. O'Flaherty & Belgum*, 38 Cal.App.4th 1229, 1236-37 (2d Dist. 1995)). "But when an insurer provides counsel to defend its insured, a conflict of interest may arise because the outcome of

---

[16]Even if the First Re-Tender had not triggered the duty to defend, the Third Re-Tender certainly did. Dixie Switzer's trial testimony directly contradicted the language in the Weide Email. (ECF No. 269-29 at 2-3.) The Court rejects Defendant's narrow understanding of its duty—the fact that Dixie Switzer's testimony did not explicitly reference the Weide Email does not absolve Defendant of its knowledge that a previous communication it knew about said that Switzer had been banned from selling product in California, and testimony under oath stated that although Alphatec terminated Omega's contract, Switzer could and did still sell under Epsilon. (*Id.*)

1   litigation may also decide the outcome of a coverage determination—a determination that

2   may pit the insured's interest against the insurer's." *State Farm Mut. Auto. Ins. Co. v.*

3   *Hansen*, 357 P.3d 338, 340 (Nev. 2015). "Where the clients' interests conflict, the rules

4   of professional conduct prevent the same lawyer from representing both clients." *Id.* at

5   341. In such a situation, "Nevada law requires the insurer to satisfy its contractual duty to

6   provide representation by permitting the insured to select independent counsel and by

7   paying the reasonable costs of such counsel." *Id.*

8           In articulating this rule, the Nevada Supreme Court adopted the rule established

9   by *San Diego Navy Federal Credit Union v. Cumis Insurance Society, Inc.*, 162

10  Cal.App.3d 358 (4th Dist. 1984), construing the so-called "*Cumis* rule" as requiring

11  "insurers to fulfill their duty to defend by allowing insureds to select their own counsel and

12  paying the reasonable costs for the independent counsel's representation." *Hansen*, P.3d

13  338, 341. Post-*Cumis*, California codified its standard in Civil Code § 2860(c). Section

14  2860(c) does not cap attorneys' fees, but rather limits the insurer's obligation "to the rates

15  which are actually paid by the insurer to attorneys retained by it in the ordinary course of

16  business in the defense of similar actions in the community where the claim arose or is

17  being defended."

18                          **2.      Analysis**

19          As a preliminary matter, the Court disagrees that this subset of Plaintiffs' breach

20  of contract claim is "irrelevant" to this action. Defendant is incorrect that Plaintiffs could

21  have raised the failure to pay independent counsel in the Coverage Action because the

22  district court found that Defendant owed no duty to defend at that time. The duty to pay

23  independent counsel arises from the insurer's duty to defend. *See Hansen*, 357 P.3d at

24  340-41. Because Plaintiffs claim arises from the duty to defend, which was triggered by

25  the First Re-Tender, this claim is properly before the Court.

26          Moreover, the Court agrees with Plaintiffs that Nevada law, not California law,

27  applies to the pay rate for independent counsel. The duty to pay independent counsel

28  arises from the duty to defend, *see id.*, which is created by the Policy, *see Nautilus*, 482

                                              25

1  P.3d at 687, which is here governed by Nevada law. Accordingly, Nevada law controls

2  Defendant's duties with regards to paying independent counsel when a conflict of interest

3  arises.

4        Regardless, the Court finds that Plaintiffs have failed to establish they are entitled

5  to summary judgment on this claim. First, Plaintiffs have failed to articulate why applying

6  California law creates a per se different outcome from Nevada law. The Nevada rule

7  articulated in *Hansen*—that the insurer is required to pay "reasonable" fees for

8  independent counsel—is expressly derived from California's *Cumis* rule. *See Hansen*,

9  357 P.3d at 341. Plaintiffs have not explained or established that the *Cumis* rules'

10  successor, Section 2860, necessarily results in lower or more restrictive fees for

11  independent counsel than Nevada's rule.

12        The evidence Plaintiffs provide, though probative, is not conclusive. Plaintiffs

13  established that Defendant's counsel charges substantially more than its stated panel

14  rate, including associate billing at $255/hour and partner billing at $285/hour at some point

15  in this case (ECF No. 281-5 at 3), and between $325/hour and $365/hour during the

16  *Switzer* Action (ECF No. 281-4 at 4). But Plaintiffs do not provide the hourly rate of their

17  independent counsel, nor do they explain that the fees Defendant paid to its coverage

18  counsel in the *Switzer* Action or its defense counsel in the Coverage Action are similar in

19  kind to what Defendant would pay to defend its insureds in the *Switzer* Action. The Court

20  finds that, based on the evidence before it, Plaintiffs have failed to meet their burden of

21  establishing Defendant's rate for independent counsel was not "reasonable." Plaintiffs'

22  Motion will therefore be denied.

23        **D.    Promissory Estoppel**

24        Plaintiffs' second claim in the SAC is for promissory estoppel. Plaintiffs argue that

25  irrespective of Defendant's duty to defend under the Policy, Defendant was estopped from

26  withdrawing its defense because of promises it made in the November 7 Letter. (ECF No.

27  73 at 20-21.) The November 7 Letter, which was sent shortly after the district court

28

granted Nautilus's summary judgment motion in the Coverage Action, stated in relevant part:

> On behalf of Nautilus, we are writing to advise that Nautilus will continue to provide a defense to its Insureds in the Underlying Action until there is a decision on the Insureds' motion for reconsideration and appeal, if any. Nautilus will continue to provide for the Insureds' defense under a complete reservation of rights, including the right to demand that the Insureds reimburse Nautilus for defense fees and costs which Nautilus will continue to incur in the defense of each of the Insureds in the Underlying Action. Any defense costs incurred in the Underlying Action following the Court's ruling granting Nautilus's motion for summary judgment will be added to Nautilus's reimbursement claim. Should the Insureds object to Nautilus's continuing to provide a defense on their behalf, they should advise Nautilus immediately.

(ECF No. 269-12 at 2.) Nautilus clarified that "nothing in this letter abrogates, curtails, extinguishes, limits or lessens, or in any other capacity restricts the reservation of rights asserted to date by Nautilus, including but not limited to, the rights reserved by Nautilus in its May 19, 2014, October 2, 2014, October 14, 2014, and April 5, 2016 reservation of rights letters. Nautilus reserves all rights under the policy." (*Id.* at 2-3.)

Despite its prior representation, Nautilus withdrew the defense prior to the disposition of the appeal. (ECF No. 269-13.) In a letter dated July 6, 2017, Nautilus informed Access Medical and Wood:

> [E]ffective August 1, 2017, Nautilus will no longer provide a defense for the underlying cross-complaint. This is because the United States District Court, District of Nevada ruled that Nautilus had no duty to defend or indemnify its Insureds. This ruling was upheld on the Insureds' motion for reconsideration. Although an appeal has been filed, there is no indication that the District Court's decision, that Nautilus had no duty to defend or indemnify its Insureds, will be overturned on appeal.

(*Id.* at 2.)

Defendant argues it is entitled to summary judgment on the promissory estoppel claim for four reasons: (1) the November 7 Letter is not a promise upon which Plaintiffs could have reasonably relied, (2) Plaintiffs knew that withdrawal of defense was a possibility because the letter expressly included the reservation of rights, (3) any injury Plaintiffs suffered was attributable to their counsel in the *Switzer* Action, and (4) the existence of the Policy, which is a written contract, obviates Plaintiffs' claim for promissory estoppel. (ECF No. 265 at 27.) As explained further below, the Court finds that

1  Defendant's representation did constitute a promise, but Plaintiffs have failed to establish
2  any change of position resulting from their reliance on that promise. Plaintiffs' promissory
3  estoppel claim therefore necessarily fails.

### 1.    Legal Standard

5  Under Nevada law, promissory estoppel has four elements: "(1) the party to be
6  estopped must be apprised of the true facts; (2) [the party] must intend that his conduct
7  shall be acted upon, or must so act that the party asserting estoppel has the right to
8  believe it was so intended; (3) the party asserting the estoppel must be ignorant of the
9  true state of facts; (4) he must have relied to his detriment on the conduct of the party to
10 be estopped." *Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203, 1209 (Nev. 2015) (quoting
11 *Pink v. Busch*, 691 P.2d 456, 459-60 (Nev. 1984)). "The promise giving rise to a cause of
12 action for promissory estoppel must be clear and definite, unambiguous as to essential
13 terms, and the promise must be made in a contractual sense." *Id.* (quoting 31 C.J.S.
14 *Estoppel and Waiver* § 116 (2008)). Even if a promise is shown, "[a] promisor will only be
15 liable for conduct intended to induce reliance on a promise 'if the action induced amounts
16 to a substantial change of position.'" *Id.* (quoting 28 Am.Jur.2d *Estoppel and Waiver* § 51
17 (2011)).

### 2.    Analysis

19 As a preliminary matter, neither party disputes that Defendant was apprised of the
20 true facts of the situation. Accordingly, the only elements in dispute are whether Plaintiffs
21 justifiably relied upon the November 7 Letter, whether that reliance caused a detriment to
22 Plaintiffs, and whether Plaintiffs were ignorant to the true state of facts.

23 First, the Court finds that Defendant's representation that it would continue to
24 provide a defense "until there is a decision on the Insureds' motion for reconsideration
25 and appeal, if any" is a promise either on which Defendant intended Plaintiffs to rely or
26 on which Plaintiffs were justified in relying. (ECF No. 269-12 at 2.) The representation is
27 sufficiently clear and definite, and its terms are unambiguous—Defendant will continue to
28 provide the defense, but will be seeking reimbursement for any costs incurred during its

continued defense. (*Id.* at 2.) Defendant also informed Plaintiffs that if they do not want it to continue to provide a defense, "they should advise Nautilus immediately." (*Id.*) By providing the period of time that the defense would be provided, the terms under which the defense would be provided, and the means for rejecting the defense, the promise was clearly made in a contractual sense. The Court therefore finds that the representation in the November 7 Letter was a promise upon which Plaintiffs had the right to believe Defendant would act.

Despite this finding that the November 7 Letter was a promise, Plaintiffs' claim fails because they have failed to show that they relied on that promise to their detriment. In the SAC, Plaintiffs allege that the withdrawal of defense "worsened the circumstances of the Insureds due to not being properly defended in the *Switzer* Action during trial, which resulted in the Insureds receiving a verdict against them in the *Switzer* Action." (ECF No. 73 at 20.) But when pressed on this question at his deposition, Wood stated only that after receiving the letter withdrawing the defense, his "focus was on trying to scramble and put monies together so that [he] could keep the case going." (ECF No. 281-9 at 22.) When asked what Plaintiffs would have done differently had Defendant terminated its defense after winning their summary judgment motion in the Coverage Action instead of waiting until Defendant withdrew its defense, Wood stated only that he "would have planned more long-term" and "would have made sure [he] had more money set aside to[] pay attorneys." (*Id.*) Although Plaintiffs suggest in their Motion that their counsel in the Coverage Action requested a $300,000 retainer leading up to the trial (ECF No. 301 at 35), Wood admits that they were not required to pay the retainer and counsel proceeded to represent them without it (ECF No. 281-9 at 22). Moreover, nowhere do Plaintiffs link the stress they may have felt to any adverse outcome in the trial. Because Plaintiffs have not proffered any evidence that harm they suffered was attributable to their reliance on the promise in the November 7 Letter, they have failed to prove a necessary element of their promissory estoppel claim.

///

29

The Court need not resolve whether Plaintiffs were ignorant of the true state of facts for the purpose of promissory estoppel because Plaintiffs cannot show that they detrimentally relied upon Defendant's promise. The Court notes, however, that there is likely a dispute of fact as to whether Plaintiffs had knowledge of the true facts. Despite Defendant's argument that its reference to its reservation of rights is sufficient to have informed Plaintiffs that it could withdraw the defense at any time, the Court is persuaded by Plaintiffs' argument that the lack of express notification meant that Plaintiffs would have reasonably concluded that Defendant was promising not to exercise that right. Additionally, Defendant's argument that its relationship with Plaintiffs was governed solely by the Policy and therefore promissory estoppel is not available is inapposite. Plaintiffs' promissory estoppel claim is predicated on a representation Defendant made separate and apart from the Policy—indeed, in spite of it. Plaintiffs are free to argue an alternate theory for their claim that Defendant owed them a duty to defend them in the *Switzer* Action.

Because Plaintiffs have failed to demonstrate evidence that they relied on Defendant's promise to their detriment, the Court will grant Defendant's Motion and deny Plaintiffs' Motion on the promissory estoppel claim.

**E.   Bad Faith**

In the third claim in the SAC, Plaintiffs allege Defendant tortiously breached the implied covenant of good faith and fair dealing. (ECF No. 73 at 22-23) Defendant's argument is cursory, but twofold. First, Defendant argues that because it had no duty to defend, it could not have acted in bad faith as a matter of law. (ECF No. 265 at 25.) Plaintiffs counter that bad faith is a separate question from the duty to defend, and lack of breach does not obviate a bad faith claim. (ECF No. 301 at 25-26.)

Second, Defendant argues that its basis for denying the defense was reasonable, as the re-tenders merely reiterated previous arguments that the district court had already rejected. (ECF No. 265 at 25-26.) Plaintiffs claim Defendant's conduct was objectively unreasonable, and therefore they are entitled to summary judgment. The Court focuses

1    on whether Defendant's decisions were reasonable because, as explained above,

2    Defendant's duty to defend was triggered by the First Re-Tender.

3                    **1.    Legal Standard**

4         "Although every contract contains an implied covenant of good faith and fair

5    dealing, an action in tort for breach of the covenant arises only 'in rare and exceptional

6    cases' when there is a special relationship between the victim and tortfeasor." *Ins. Co. of*

7    *the West v. Gibson Title Co., Inc.*, 137 P.3d 698, 702 (Nev. 2006); *see also Allstate Ins.*

8    *Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009) (explaining that Nevada law, not the

9    insurance policy, imposes obligations on insurers under the implied covenant of good

10   faith and fair dealing). The relationship between an insurer and its insureds is one such

11   special relationship. *Ins. Co. of the West*, 137 P.3d at 702.

12        "A violation of the covenant gives rise to a bad-faith tort claim." *Allstate*, 212 P.3d

13   at 324. "To prevail on such a claim, a plaintiff must allege that (1) an insurer-insured

14   relationship exists; (2) the insurer breached its duty by refusing to defend or indemnify its

15   insureds for a loss covered by the policy; (3) the denial is without proper cause, meaning

16   the insurer has an 'actual or implied awareness of the absence of a reasonable basis for

17   denying the benefits of the policy.'" *Ariz. Civil Constructors, Inc. v. Colony Ins. Co.*, 481

18   F.Supp.3d 1141, 1151 (D. Nev. 2020) (quoting *Am. Excess Ins. Co. v. MGM*, 729 P.2d

19   1352, 1354-55 (Nev. 1986)). In other words, "[b]ad faith is established where the insurer

20   acts unreasonably and with knowledge that there is no reasonable basis for its conduct."

21   *Guar. Nat'l Ins. Co. v. Potter*, 912 P.2d 267, 272 (Nev. 1996). "It is not enough to show

22   that, in hindsight, an insurer acted unreasonably; the plaintiff must show that the insurer

23   knew or recklessly disregarded that it was acting unreasonably." *Fernandez v. State Farm*

24   *Mut. Auto. Ins. Co.*, 338 F.Supp.3d 1193, 1200 (D. Nev. 2018). When a genuine dispute

25   exists about the insurer's reasonableness, summary judgment is inappropriate because

26   that question must be decided by the factfinder. *See Fernandez*, 338 F.Supp.3d at 1200-

27   01 (D. Nev. 2018).

28   ///

                                    31

1

2.     **Analysis**

2        As explained above, the Court finds that Defendant breached its duty to defend

3    Plaintiffs after the First Re-Tender. The only remaining question is whether Defendant

4    had an "actual or implied awareness" that it lacked a reasonable basis for denying the

5    benefits of the policy. *See Ins. Co. of the West*, 137 P.3d at 702. Because the parties'

6    genuinely dispute the reasonableness of Defendant's withdrawal of defense in the *Switzer*

7    Action, the Court will deny both parties' Motions.

8        The Court agrees with Defendant it is arguably reasonable that Defendant relied

9    upon the district court's summary judgment order to withdraw their defense after receiving

10   the First Re-Tender. Defendant had received a final judgment that it owed Plaintiffs no

11   duty to defend, based in large part on the absence of any false statement in the Weide

12   Email. Even though there was a discrepancy between what Weide told Cottage Hospital

13   in the Weide Email—that Switzer was "banned from selling Alphatec implants" in

14   California (ECF No. 269-4 at 2)—and the deposition testimony proffered with First Re-

15   Tender—that Alphatec had terminated its contract with Omega, one of Switzer's LLC's

16   (ECF Nos. 269-15 at 5, 269-17 at 6, 269-18 at 6)—the reason Defendant gave for denying

17   the First Re-Tender was that the Weide Email "was true." (ECF No. 269-19 at 5.)

18   Moreover, even though the district court expressly did not consider whether the deposition

19   testimony triggered the duty to defend, the district court did cast doubt on the likelihood

20   that the new evidence would trigger the duty to defend. (ECF No. 269-20 at 5.)

21       Defendant's position becomes less defensible after the Third Re-Tender, when it

22   is revealed that the Weide Email did in fact contain a false statement. There, Plaintiffs

23   had provided Defendant with Dixie Switzer's testimony that Switzer "continued to sell

24   under Epsilon at Cottage Hospital" and "we were not banned." (ECF No. 269-24 at 3.)

25   Defendant then altered its reason for rejecting the defense, arguing that Dixie Switzer's

26   testimony by itself does not meet the definition of disparagement under California law,

27   and that she did not explicitly refer to the Weide Email. (ECF No. 269-25 at 3.) Despite

28   knowing that a core issue in the Coverage Action was whether there was a false

1    statement that could undergird Switzer's interference with prospective economic

2    advantage, here Defendant applies an extremely narrow reading of the district court's

3    findings even after discovering that a false statement did in fact exist. Still, the Court finds

4    that whether this decision was unreasonable and, if so, whether it evinced "reckless

5    disregard," remain genuinely disputed. *See Fernandez*, 338 F.Supp.3d at 1200-01 (D.

6    Nev. 2018).

7         As an alternate explanation, Defendant argues that its repeated denials were

8    reasonable because there was still no claim for disparagement or other defamation. (ECF

9    No. 283 at 16-17.) As explained above, the Policy does not clearly require that an actual

10   claim for defamation be alleged, and Nevada law requires construing ambiguities in the

11   Policy in favor of coverage for the insured. But Defendant's subjective understanding of

12   the Policy's coverage matters for bad faith, and here a jury could find that Defendant's

13   interpretation of the Policy, though unlawfully narrow, was a reasonable error.

14        Because a genuine factual dispute exists as to whether Defendant's denial of the

15   re-tenders was reasonable, the Court will deny both Motions as to the bad faith claim.

16        **F.    Unfair Claims Practices**

17        Plaintiffs' fourth claim alleges that Defendant violated NRS § 686A.310, Nevada's

18   unfair claims practices statute. (ECF No. 73 at 26-28.) Specifically, Plaintiffs allege

19   Defendant's conduct violated the following provisions:

20       (a) Misrepresenting to insureds or claimants pertinent facts or insurance
        policy provisions relating to any coverage at issue.

21       (b) Failing to acknowledge and act reasonably promptly upon
        communications with respect to claims arising under insurance policies.

22       (c) Failing to adopt and implement reasonable standards for the prompt
        investigation and processing of claims arising under insurance policies.

23       (d) Failing to affirm or deny coverage of claims within a reasonable time
        after proof of loss requirements have been completed and submitted by

24        the insured.

25       (e) Failing to effectuate prompt, fair and equitable settlements of claims in
        which liability of the insurer has become reasonably clear.

26       (f) Compelling insureds to institute litigation to recover amounts due under
        an insurance policy by offering substantially less than the amounts
        ultimately recovered in actions brought by such insureds, when the

27        insureds have made claims for amounts reasonably similar to the
          amounts ultimately recovered.

28

33

1    (*Id.* (citing NRS § 686A.310(a)-(f)).) Both parties argue they are entitled to summary

2    judgment on the unfair claims practices claims. As explained further below, the Court

3    disagrees, and will therefore deny both Motions.

4                              **1.    Defendant's Motion**

5         Defendant extrapolates from its bad faith argument that because its conduct was

6    reasonable, Plaintiffs' unfair claims practices claim fails as a matter of law. (ECF No. 265

7    at 26.) In fact, Defendant's only argument about unfair claims practices is that Nevada

8    law requires a predicate showing of unreasonable action by an insurer to support a claim

9    under NRS § 686A.310. (*Id.*) Because the reasonableness of Defendant's actions is still

10   in dispute, the Court will likewise deny Defendant's Motion on the unfair claims practice

11   claim.

12                              **2.    Plaintiffs' Motion**

13        Plaintiffs argue they are entitled to summary judgment on each alleged violation of

14   NRS § 686A.310. (ECF No. 301 at 29-34.) Viewed in the light most favorable to

15   Defendant, Plaintiffs have failed to demonstrate they are entitled to summary judgment

16   on their any of their unfair claims practice claims. The Court will therefore also deny

17   Plaintiffs' Motion.

18                         **a.    Misrepresentation of Pertinent Facts**

19        Plaintiffs argue that Defendant made five misrepresentations which violated NRS

20   § 686A.310(a): (1) Defendant stated in the November 7 Letter it would defend Plaintiffs

21   in the *Switzer* Action, then later withdrew its defense; (2) Defendant misstated the

22   applicable law with respect to paying counsel in the *Switzer* Action; (3) Defendant

23   misstated the applicable law governing the terms of the Policy; (4) Defendant claimed it

24   was genuinely reviewing the re-tenders, when in reality it had already decided to deny all

25   re-tenders despite the new information; and (5) Defendant incorrectly stated that there

26   could be no bad faith where there is no duty to defend. (ECF No. 301 at 29.) Defendant

27   argues none of these constitute "misrepresentation" under the statute. (ECF No. 305 at

28   26-27.)

                                          34

The Court finds there is a genuine dispute of fact as to whether the November 7 Letter misrepresented "pertinent facts" relating to its duty to defend. The duty to defend is part of coverage under the Policy, and Defendant clearly communicated that it would continue to defend Plaintiffs through any appeal despite receiving a judgment that it owed no duty to defend in the Coverage Action. Defendant then reneged before the judgment was appealed, despite no material change in the case. However, Defendant clearly stated in the November 7 Letter that it had received a judgment that it owed no duty to defend, and it would continue its defense under a full reservation of rights. At no time had Defendant communicated to Plaintiffs that it believed it may have a duty to defend in the *Switzer* Action. Although Defendant's promise to continue its defense was not true, whether the November 7 Letter constituted a misrepresentation of "pertinent facts" relating to its duty to defend is not clear.

Next, the Court finds that Plaintiffs have not shown that misstating the applicable law would violate § 686A.310(a). Even assuming that applying the incorrect state's law would constitute a misrepresentation of a "fact" relating to coverage, Plaintiffs offer no argument as to whether applying California law rather than Nevada law would change Defendant's duties or obligations. Plaintiffs have not met their burden that this misrepresentation is "pertinent." Relatedly, Plaintiffs do not explain how Defendant's representation that it cannot be liable for bad faith when there is not a duty to defend relates in any way to coverage under the Policy. Plaintiffs have failed to show that these misapplications or misstatements of law are misrepresentations of coverage.

Finally, Plaintiffs have not shown that Defendant misrepresented that it was evaluating the re-tenders. Plaintiffs argue that this is the case, but do not provide any direct evidence that Defendant failed to evaluate each re-tender in good faith. While the Court agrees that a juror could reasonably infer Defendant's changing rationales for rejecting the re-tenders evince an outcome-motivated decision process, the factfinder could similarly conclude that each re-tender independently resulted in a finding of no coverage. The Court therefore denies Plaintiffs' Motion as to subsection (a).

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.   Failing to Promptly Communicate

Because Defendant withdrew the defense just weeks before the jury trial, Plaintiffs claim Defendant violated NRS § 686A.310(b). (ECF No. 301 at 30.) More generally, Plaintiffs argue that Defendant "failed to inform, document, and analyze the Insureds' Tenders of Defense." (*Id.*) Plaintiffs' allegations in the Motion are cursory and do not clearly explain the violation under subsection (b). Nevertheless, a reasonable juror could find Defendant's withdrawal was not promptly communicated, either because of the delay from the time Defendant had all relevant information or the proximity of the withdrawal to trial. However, the factfinder could also find that Defendant's position changed after the district court denied Plaintiffs' motion for reconsideration in the Coverage Action. Plaintiffs have not offered any evidence or argument about how much time is considered "prompt," and, even if they had, this is likely at least a mixed factual question more appropriate for the factfinder. Viewed in the light most favorable to Defendant, a reasonable juror could find that Defendant responded as quickly as reasonably possible to Plaintiffs' inquiries and re-tenders. Accordingly, Plaintiffs have not demonstrated they are entitled to judgment on this claim as a matter of law. The Court therefore denies Plaintiffs' Motion as to subsection (b).

### c.   Failing to Implement Reasonable Investigation Standards

Plaintiffs' argument that Defendant violated NRS § 686A.310(c) is twofold. First, Plaintiffs contend that despite heavy litigation over the Policy, "there is no documentation that shows that Nautilus made a coverage determination or completed its investigation into the Interference with Prospective Economic Advantage claim that Switzer alleged in his Cross-Complaint in the Switzer Action." (ECF No. 301 at 30.) Second, Plaintiffs claim that Defendant improperly shifted its duty to investigate onto its insureds, waiting for Plaintiffs to provide evidence of coverage while failing to conduct its own investigation. (*Id.* at 31.) The Court disagrees that either of these arguments warrant summary judgment.

///

First, the opinion of expert witness Strzelec, though potentially informative for the jury as to industry practice, does not conclusively establish that Defendant failed to investigate the re-tenders. Indeed, the re-tenders themselves indicate the opposite— each establishes a basis for rejecting the defense, and explains Defendant's reasoning. Again, whether a jury will find those explanations reasonable is an open question, but Plaintiffs have failed to show that, as a matter of law, Defendant's investigation was unreasonable.

Second, Defendant's repeated invitation that Plaintiffs forward any new information that may trigger coverage does not in itself impermissibly shift the burden onto Plaintiffs. Defendant may encourage Plaintiffs to provide it with information without abrogating its duties to investigate the re-tenders. While it may be probative that information about the Weide Email's veracity came out in testimony after Defendant claimed it believed the Weide Email was true, Plaintiffs have offered no clear evidence that Defendant did not investigate the claim, nor have Plaintiffs clearly articulated how the investigation was deficient. Accordingly, the Court will deny Plaintiffs' Motion as to subsection (c).

### d.    Failing to Timely Affirm or Deny Coverage

Plaintiffs further claim that from the beginning of the *Switzer* Action, Defendant failed to timely determine coverage. (ECF No. 301 at 31.) Despite tendering the claim on November 14, 2013, Defendant failed to communicate its decision until May 19, 2014. (*Id.*) Plaintiffs also argue that notifying Plaintiffs on July 6, 2017, that it would be withdrawing their defense effective August 1, 2017, when trial was set to begin on August 22, 2017, is "extraordinarily untimely." (*Id.* at 32.) Again, the Court finds summary judgment is inappropriate on these claims.

Plaintiffs have not offered any evidence or argument that six-months is an unreasonable amount of time for an insurer to evaluate a claim, much less that it is unreasonable as a matter of law. Although Plaintiffs cite again to Strzelec's report for this conclusion, Strzelec does not conclude in the report that Defendant did not timely respond to the tender. (ECF Nos. 301 at 31, 281-4 at 10-12.) Instead, Strzelec opines that "[w]ithin

1    a month of tender Nautilus should have recognized the need to investigate." (ECF No.

2    281-4 at 12.) Strzelec's determination does not comment on whether taking six-months

3    to deny a claim is per se unreasonable.

4            While Defendant's withdrawal of defense was very close to trial and the Court

5    agrees that it both could and should have occurred earlier, Plaintiffs fail to argue that

6    Defendant's denial of coverage was untimely. As explained above, although Defendant

7    agreed to continue defending Plaintiffs, Defendant repeatedly informed Plaintiffs it had

8    determined it had no obligation to do so under the Policy. A violation of § 686A.310(d)

9    requires failing to timely affirm or deny coverage—here, Defendant has made clear that

10   it denies the Policy requires it to defend Plaintiffs. Plaintiffs have therefore failed to

11   demonstrate a claim under subsection (d), and the Court will deny Plaintiffs' Motion.

12                     **e.      Failing to Promptly Settle When Liability is Clear**

13           Plaintiffs make several arguments about Defendant's duty to settle the *Switzer*

14   Action. (ECF No. 301 at 32-33.) But § 686A.310(e) requires that the insurer's liability be

15   "reasonably clear" before a violation may be found. As discussed at length above,

16   precisely when the duty to defend was triggered in the *Switzer* Action was hotly disputed.

17   The Court finds that the duty to defend was triggered by the First Re-Tender, submitted

18   July 28, 2017. Prior to learning the Weide Email was false, Defendant had no duty to

19   defend and, consequently, no duty to attempt to settle the *Switzer* Action. Moreover, the

20   Court acknowledges that the district court's order denying the motion for relief from

21   judgment cast doubt upon whether the deposition testimony triggered the duty to defend,

22   potentially providing a basis for Defendant's continued denial to be reasonable.

23   Defendant's consideration of settlement and decision not to attempt to settle the *Switzer*

24   Action spans August 7, 2017, to August 9, 2017. (ECF No. 281-4 at 2.) Although the duty

25   to settle existed during this time, Plaintiffs have failed to show that the duty to settle was

26

27

28

                                                 38

1  "reasonably clear" as a matter of law.[17] Accordingly, the Court will deny Plaintiffs' Motion
2  as to subsection (e).

3           **f.    Compelling Insureds to Litigate for Benefits Owed**

4           Lastly, Plaintiffs argue that by requiring Plaintiffs to litigate to enforce Defendant's
5  duty to defend them under the Policy, Defendant violated NRS § 686A.310(f). But it is not
6  clear that subsection (f) applies in this instance. Even assuming that failing to defend
7  despite a duty to do so constitutes "[c]ompelling insureds to institute litigation to recover
8  amounts due under an insurance policy," the remainder of subsection (f) references an
9  insurer "offering substantially less than the amounts ultimately recovered in actions
10 brought by such insureds, when the insureds have made claims for amounts reasonably
11 similar to the amounts ultimately recovered." *See* NRS § 686A.310(f). Plaintiffs do not
12 explain what "amounts" they have "ultimately recovered," nor what their prior demands
13 were. The Court declines to speculate as to what Plaintiffs would argue to flesh out their
14 claim, and finds they have not met their burden of showing they are entitled to judgment
15 as a matter of law. Accordingly, the Court will deny Plaintiffs' Motion as to subsection (f).

16          In sum, because neither party has established entitlement to summary judgment
17 on the unfair claims practices claims, the Court will deny both parties' Motions.

18 **V.    CONCLUSION**

19          The Court notes that the parties made several arguments and cited to several
20 cases not discussed above. The Court has reviewed these arguments and cases and
21 determines that they do not warrant discussion as they do not affect the outcome of the
22 motions before the Court.

23          It is therefore ordered that Defendant's motion for summary judgment (ECF No.
24 265) is granted as to the promissory estoppel claim and denied as to all other claims.

25
26
27          [17]It is unclear how Plaintiffs' argument that the post-appeal settlement offer was
28 "egregious" and "exclusively benefited Nautilus in an attempt to cut off its bad faith
   exposure" relates to Defendant's duty to settle in the *Switzer* Action, and the Court
   declines to consider the evidence. (ECF Nos. 301 at 33. 281-16.)

Summary judgment is granted in favor of Defendant on Plaintiffs' promissory estoppel claim.

It is further ordered that Plaintiffs' motion for partial summary judgment (ECF No. 301) is granted as to the breach of contract for failing to defend after the duty was triggered, and denied as to all other claims. The Court finds that Plaintiffs have demonstrated liability on their breach of contract claim, but the issue of damage caused by that breach remains for trial.

DATED THIS 22nd Day of March 2022.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE