1
2
3

UNITED STATES DISTRICT COURT

4

DISTRICT OF NEVADA

5

* * *

6

ROBERT SONNY WOOD, *et al.*,

Case No. 2:17-cv-02393-MMD-VCF

7

Plaintiffs,

BENCH ORDER

v.

8

NAUTILUS INSURANCE COMPANY,

9

Defendant.

10

11

**I.    SUMMARY**

12

Plaintiffs Robert "Sonny" Wood and Access Medical, LLC sued Defendant Nautilus

13

Insurance Company for breach of contract, bad faith, and unfair claims practices

14

regarding an underlying insurance coverage dispute. Nautilus filed a counterclaim for

15

unjust enrichment. The Court held a bench trial (the "Trial"). (ECF Nos. 407-409, 411

16

(minutes of proceedings); ECF Nos. 414-417 (trial transcripts).) After the Trial, Plaintiffs

17

filed motions to amend.[1] (ECF No. 421, 422.) The Court first addresses the motions to

18

amend, then makes the below findings of fact and conclusions of law based on the

19

evidence presented during the Trial. As further explained below, the Court denies

20

Plaintiffs' motions to amend and finds that Nautilus mostly prevails regarding damages

21

for the claim for breach of the contractual duty to defend, Plaintiffs prevail on the claim for

22

breach of the contractual duty to pay reasonable costs of independent counsel, Plaintiffs

23

prevail in part and Nautilus prevails in part on the claims for bad faith, Nautilus prevails

24

on the claims arising under the Nevada Unfair Claims Practices Act, and Plaintiffs prevail

25

on Nautilus's counterclaim for unjust enrichment.

26
27
28

---

[1]Nautilus responded (ECF Nos. 425, 426), and Plaintiffs replied (ECF No. 429, 430).

## II.     MOTIONS TO AMEND

### A.     Motion to Amend Complaint (ECF No. 421)

Plaintiffs move to add a request for reputational damages to their bad faith claim and a request for indemnity damages to their breach of contract claim. (ECF No. 421 at 3.) First, the Court denies the motion to add reputational damages because Plaintiffs did not make the required disclosures for those damages. As the Court ruled at Trial (ECF No. 414 at 125-28), because Plaintiffs never disclosed reputational damages in any of their 16 disclosures under Federal Rule of Civil Procedure 26 (*see, e.g.*, ECF No. 382-1 at 20), it would be unfair to Nautilus to permit such damages given that it had insufficient notice of this theory of damages. The Court declines to reconsider its ruling regarding these damages.

Second, the Court denies the motion to add indemnity damages, or a claim for breach of the contractual duty to indemnify, because of a lack of fair notice to Nautilus. As the Court noted at the Trial (ECF No. 416 at 9-10) and reiterates here, a claim for breach of the duty to indemnify is not part of the breach of contract claim in Plaintiffs' operative complaint (ECF No. 73 at 18-19) and therefore would not be considered by the Court.

Plaintiffs cannot show that either reputational or indemnity damages was tried by the parties' express or implied consent under Rule 15. The Court accordingly denies Plaintiffs' motion to amend their complaint to conform to evidence (ECF No. 421).

### B.     Motion to Amend Summary Judgment Order (ECF No. 422)

Plaintiffs seek to amend this Court's March 22, 2022 summary judgment order (ECF No. 315) to change the triggering date of Nautilus's duty to defend Plaintiffs from July 28, 2017 to September 23, 2016—the date that Nautilus's defense counsel prepared a pre-mediation evaluation report. (ECF No. 422 at 3.) The Court construes this motion as a motion for reconsideration of its prior order.

Reconsideration is an "extraordinary remedy" that should be used "sparingly." *See Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). Reconsideration is appropriate if

2

1   the Court: "(1) is presented with newly discovered evidence, (2) committed clear error or

2   the initial decision was manifestly unjust, or (3) if there is an intervening change in

3   controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)

4   (citation omitted). But "[a] motion for reconsideration is not an avenue to re-litigate the

5   same issues and arguments upon which the court already has ruled." *Brown v. Kinross*

6   *Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005) (citation omitted).

7       Plaintiffs here are essentially re-hashing the same issue that the Court already

8   ruled on and the same arguments that were before the Court at the summary judgment

9   phase. (*See, e.g.*, ECF No. 301 at 23 (Plaintiffs arguing on summary judgment that "[t]he

10   Mediation Report alone would trigger coverage").) Moreover, as Nautilus argues (ECF

11   No. 426 at 3) and the Court agrees, Plaintiffs do not present new evidence—the Trial

12   testimony that Plaintiffs point to merely confirms evidence that was already previously

13   before the Court regarding Nautilus's knowledge based on the information contained in

14   the pre-mediation report. In any event, the Court finds that the proffered Trial testimony

15   would not change the outcome of the Court's summary judgment ruling.

16       The Court therefore finds no basis for reconsideration and denies Plaintiffs' motion

17   to amend the summary judgment order (ECF No. 422.)

18   **III.   FINDINGS OF FACT**

19       The Court makes the following findings of fact based on the testimony and other

20   evidence admitted during the course of the Trial,[2] along with the pre-trial and post-trial

21   briefing the parties filed in this case (ECF Nos. 396, 399, 419, 420).

22       **A.   Background of Parties and Insurance Policy**

23       1.   Nautilus is an insurance company organized and existing under the law of

24   the State of Arizona with its principal place of business in Scottsdale, Arizona. (ECF No.

25   404 at 2.)[3]

26

27       [2]The parties submitted joint exhibits marked as Nos. 1-227. (ECF Nos. 400, 413.)
    "Ex." in this order refers to an exhibit admitted at Trial.

28

       [3]Citations to ECF No. 404 indicate citations to the parties' joint stipulated facts.

2. Access Medical is a Delaware limited liability company with its principal place of business in Nevada. Access Medical transacts business in Nevada. (*Id.*)

3. Wood, during the relevant period, was a resident of Nevada. (*Id.*) Wood is a managing member of Access Medical and, during the relevant period, was a managing member of Flournoy Management, LLC—a company involved in the underlying coverage action. (*Id.*)

4. Nautilus issued Commercial Lines Policy No. BN952426 to named insured Access Medical, effective from January 15, 2011 to January 15, 2012 (the "Policy"), with a "Personal and Advertising Injury Limit" of $1 million. (*Id.*; Ex. 36 at 1-2, 7.) The Policy was issued in and is governed by Nevada law. (ECF No. 419 at 19; ECF No. 420 at 36.)

5. Flournoy was also added as a named insured to the Policy. (ECF No. 404 at 2.) Wood is considered an insured under the Policy as the managing member of Access Medical. (*Id.*)

6. The Policy provided coverage for "damages because of 'personal and advertising injury' to which this insurance applies." (*Id.* at 2.) In pertinent part, the Policy defines "personal and advertising injury" as:

> injury, including consequential "bodily injury," arising out of one or more of the following offenses:
> . . .
> Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services[.]

(*Id.* at 3.)

**B.    The Switzer Action**

7. In December 2011, Wood's business partner, non-party Ted Switzer, filed a complaint against Flournoy and Wood in California state court (the "Switzer Action"). (*Id.* at 3; Ex. 1.) The complaint alleged that Switzer was "concerned about the management of Flournoy [the company created by Switzer and Wood] and desire[d] to obtain information necessary to the process of evaluating whether or not Flournoy has

been managed and operated in a manner consistent with [Switzer's] rights as a member of Flournoy." (ECF No. 404 at 3.)

8.    In June 2013, Switzer filed a cross-complaint (the "Switzer Cross-Complaint") against Access Medical and Wood among others in the Switzer Action. (*Id.*; Ex. 2.)

9.    The Switzer Cross-Complaint set forth 31 causes of action, including four claims for interference with prospective economic advantage. (ECF No. 404 at 3.) These four claims alleged that Wood: (1) acted to disrupt the relationship between Switzer and hospital business partners by his wrongful acts; and (2) that those actions resulted in injury to Switzer's personal and business reputation. (*Id.*)

10.    In pertinent part, Switzer alleged that Flournoy had a longstanding relationship with Cottage Hospital (one of the hospital business partners), that Wood knew of the relationship, and that Wood acted intentionally and without justification to disrupt that relationship. (*Id.* at 3-4.) Throughout this claim, Switzer referred to Wood's "wrongful acts," without clarification of what those acts were. (*Id.* at 4.) Switzer however did state that those acts resulted in Wood "put[ting] Access in Flournoy's place, and caused . . . Cottage Hospital [to cease] using Epsilon [of which Flournoy was the sole member and manager] as a vendor of medical implants . . . but, instead, used Access for that purpose." (*Id.*; Ex. 2 at 3.)

   **C.    Initial Tender of Defense**

11.    Plaintiffs tendered the Switzer Cross-Complaint to Nautilus on or about November 14, 2013, contending that the Policy covered the claims for interference with prospective economic advantage. (ECF No. 404 at 5.)

12.    In the course of investigating the tender, Nautilus discovered a July 25, 2011 email sent by Jacquie Weide, operations manager for Access Medical, to Deborah Fanning of Santa Barbara Cottage Hospital (the "Weide Email"). (*Id.*) In that email thread, Weide advised Fanning that Access was interested in obtaining a contract with Cottage

5

Hospital to provide spinal implants. (*Id.*) When Fanning asked for more information, Weide responded in relevant part as follows:

> I believe Dr. Early and Dr. Kahmann were using Alphatec's implants but their Distributor in the California area is now banned from selling Alphatec implants. We are in Las Vegas and have been using their products here for 2 years. Alphatec recently contacted us and asked that we take over the California region as well.

(*Id.*)

13.     On May 19, 2014, Nautilus issued a letter to Plaintiffs setting forth Nautilus's agreement to provide them with a defense of the Switzer Cross-Complaint, subject to a full and complete reservations of rights to disclaim coverage and withdraw from defense, including the right to reimbursement of defense fees should it be determined that Nautilus has no duty to defend or indemnify Plaintiffs for the Switzer Cross-Complaint. (*Id.* at 5-6.)

14.     Nautilus assigned the law firm of Wolfe & Wyman LLP as defense counsel for Plaintiffs for the Switzer Cross-Complaint. (*Id.* at 6.) Wolfe & Wyman billed at the rate of $170 per hour for defense of the Switzer Cross-Complaint. (*Id.*)

15.     On October 2, 2014, Nautilus issued a supplemental reservation of rights letter to Plaintiffs. (*Id.* at 6.) This letter also agreed to provide Plaintiffs with independent counsel due to a conflict of interest. (*Id.*) The letter stated that it was "only obligated to pay fees at rates that are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended." (*Id.*) The letter stated that Nautilus's panel rates are $170 per hour for partners and $165 per hour for associate attorneys. (*Id.*)

16.     Plaintiffs selected and retained John Phillips of the law firm Wild, Carter & Tipton to be their independent counsel in 2015. (*Id.* at 7; ECF No. 414 at 106.) As of the Trial, Phillips had over 30 years of experience as a practicing attorney (ECF No. 414 at 11).

17.     At the time he was retained, Phillips's billing rate was $285 per hour. (*Id.* at 11-12.) Nautilus agreed to pay Wild, Carter & Tipton the panel rate of $170 per hour and required Plaintiffs to pay the remaining difference—$115 per hour. (ECF No. 404 at 7.)

18.     As independent counsel, Phillips directly communicated with Wood and participated in settlement discussions, mandatory settlement conferences, hearings, and depositions. (ECF No. 414 at 15, 49-51, 75, 88; ECF No. 415 at 32, 62.) He also discussed, planned, and prepared defense strategies with defense counsel. (ECF No. 414 at 55, 61.)

19.     In April 2016, Nautilus replaced Wolfe & Wyman with the law firm of Gordon Rees Scully Mansukhani LLP as defense counsel for Plaintiffs for the Switzer Cross-Complaint. (ECF No. 404 at 6.) Gordon Rees billed at rates of $265 to $285 per hour for defense of the Switzer Cross-Complaint. (*Id.*)

20.     Nautilus did not disclose Gordon Rees's higher billing rate to Plaintiffs (ECF No. 415 at 169) and never received a request from Phillips or Plaintiffs to increase the independent counsel rates paid by Nautilus to the same rates that Nautilus was paying Gordon Rees (ECF No. 414 at 63-65, 171-172). Nautilus claims it would have likely paid independent counsel the rate it was paying Gordon Rees had it been requested to do so. (ECF No. 415 at 119-120.)

**D.     Nautilus's Coverage Action**

21.     On February 24, 2015, Nautilus filed a declaratory relief action—*Nautilus Ins. Co. v. Access Medical, LLC, et al.*, Case No. 2:15-cv-00321-JAD-BNW (the "Coverage Action")—in this District seeking a judicial determination that it had no duty to defend or indemnify Access Medical, Wood, and Flournoy for the Switzer Cross-Complaint based on the information it had at the time of filing. (ECF No. 404 at 7-8.)

22.     On January 15, 2016, Nautilus filed a motion for partial summary judgment in the Coverage Action. (*Id.* at 8.) On September 27, 2016, Judge Jennifer A. Dorsey granted Nautilus's motion for partial summary judgment, determining that "Switzer's cross-complaint—even when read in conjunction with the [Weide Email]—does not give rise to a potential claim for slander, libel, or disparagement (or include allegations of those offenses), and therefore does not trigger Nautilus's duty to defend under the 'personal and advertising injury' provision of the policy." (*Id.*)

### E. Mediation of Switzer Action

23. Meanwhile, mediation in the Switzer Action was set for September 30, 2016. (Ex. 124 at 2.) In advance of that mediation, on September 23, 2016, Eleanor Welke of Gordon Rees, drafted a pre-mediation report for Nautilus in which she stated: "It is true that Jacquie Weide of Access Medical did indicate to Cottage Hospital that Plaintiff [earlier defined as Ted Switzer] had been 'banned' from selling Alphatec. However, we will argue that it was not the result of this email which caused Cottage Hospital (or any other Plaintiff's business relationships) to cease doing business with Plaintiff and that it was not the result of any actions by Wood or Access Medical that allegedly 'injured' Plaintiff's business relationships." (*Id.* at 7.)

24. Welke testified at Trial that she included a discussion of the Weide Email in the report because she believed its veracity was an issue in the Switzer Action. (ECF No. 415 at 67.)

25. In the September 23, 2016 pre-mediation report, Welke recommended to Nautilus that it provide settlement authority between $600,000 to $800,000. (Ex. 124 at 15.) Welke also informed Nautilus that Switzer repeatedly said he would not settle his claims with Access Medical or Wood for less than the policy limit, which he understood to be $1 million. (*Id.*)

26. After that pre-mediation report was drafted but before the September 30, 2016 mediation took place, Nautilus obtained the September 27, 2016 ruling in the Coverage Action that Nautilus did not owe a duty to defend the Switzer Action based on the allegations in the Switzer Cross-Complaint and Weide Email. (ECF No. 404 at 8.)

27. Nautilus did not provide any settlement authority to Welke going into the September 30, 2016 mediation, which Welke did not believe was unusual given the coverage dispute. (ECF No. 415 at 28-29.)

28. Wood had authorized a $500,000 cash contribution towards settlement at the time of the mediation. (*Id.* at 190; ECF No. 414 at 26, 128-29.)

8

**F.     Coverage Action Continued**

29.     On October 25, 2016, Nautilus filed a motion for further relief in the Coverage Action requesting an award of defense costs that Nautilus incurred to defend Plaintiffs in the Switzer Cross-Complaint and for pre- and post-judgment interest. (ECF No. 404 at 8.)

30.     On the same date, Plaintiffs filed a motion for reconsideration of Judge Dorsey's judicial declaration of no coverage under the Policy for the Switzer Cross-Complaint. *See Nautilus Ins. Co. v. Access Medical, LLC, et al.*, Case No. 2:15-cv-00321-JAD-BNW, ECF No. 80 (D. Nev. Filed October 25, 2016).

31.     On November 7, 2016, Nautilus sent correspondence to Plaintiffs reiterating its right to seek reimbursement of any amounts spent on Plaintiffs' defense. (ECF No. 404 at 6.) The letter specifically stated: (1) "Nautilus will continue to provide a defense to its Insureds in the [*Switzer*] Action until there is a decision on the Insureds' motion for reconsideration and appeal, if any. Nautilus will continue to provide for the Insureds' defense under a complete reservation of rights. . . ."; and (2) "Please note that nothing in this letter abrogates, curtails, extinguishes, limits or lessens, or in any other capacity restricts the reservation of rights asserted to date by Nautilus, including but not limited to, the rights reserved by Nautilus in its May 19, 2014, October 2, 2014, October 14, 2014 and April 5, 2016 reservations of rights letters. Nautilus reserves all rights under the policy." (Ex. 66 at 2-3.)

32.     In response, on November 9, 2016, Plaintiffs sent a letter stating: "[Plaintiffs] do not object to the continuing defense . . . . [Plaintiffs] are not agreeing, however, to reimburse Nautilus for any costs and fees paid by Nautilus." (ECF No. 404 at 6.)

33.     On May 18, 2017, Judge Dorsey denied Nautilus's motion for further relief and Plaintiffs' motion for reconsideration. (*Id.* at 8.) About a month later, both parties appealed to the Ninth Circuit. (*Id.*)

34.     On July 2, 2019, the Ninth Circuit affirmed the granting of summary judgment to Nautilus in the Coverage Action, holding that "the district court properly

entered a declaratory judgment in favor of Nautilus because the underlying proceedings did not trigger Nautilus's duty to defend" and "[e]ven if [the Weide Email] could be understood to reference Switzer, it does not contain a false statement that explicitly disparaged him . . . and therefore it did not trigger a duty to defend." (*Id.* at 10-11.)

35.     On August 9, 2021, the Ninth Circuit reversed the denial of Nautilus's request for reimbursement of defense costs after certifying a question to the Nevada Supreme Court, which held that "an insurer is entitled to reimbursement if 'a court determines that an insurer never owed a duty to defend,' 'the insurer expressly reserved its right to seek reimbursement in writing after defense was tendered,' and 'the policyholder accepted the defense from the insurer.'" *Nautilus Ins. Co. v. Access Med.*, LLC, Case No. 17-16265, 2021 WL 3485911, at *1 (9th Cir. Aug. 9, 2021) (quoting *Nautilus Ins. Co. v. Access Med., LLC*, 482 P.3d 683, 691 (Nev. 2021)).

### G.     Nautilus's Withdrawal of Defense

36.     A few weeks after Plaintiffs' motion for reconsideration was denied in the Coverage Action, Nautilus informed Plaintiffs on July 6, 2017 that it would be exercising its reserved right to withdraw from defense of the Switzer Cross-Complaint effective August 1, 2017. (ECF No. 404 at 9.)

37.     On August 1, 2017, Nautilus withdrew from its defense of Plaintiffs and ceased paying for defense fees and costs incurred on or after that date. (*Id.*)

38.     After Nautilus withdrew from the defense, Gordon Rees then attempted to withdraw as counsel for Plaintiffs in the Switzer Action. (*Id.* at 7.) However, the court denied the motion to withdraw, and Gordon Rees continued to represent Plaintiffs through trial of the Switzer Cross-Complaint. (*Id.*)

39.     After Nautilus withdrew its defense, Wild, Carter & Tipton continued to represent Plaintiffs, including during trial of the Switzer Cross-Complaint. (*Id.*)

40.     Trial of the Switzer Action began on August 22, 2017. (Ex. 9 at 2.)

### H.    First Re-Tender: Deposition Testimony

41.    After Nautilus informed Plaintiffs that it would be withdrawing its defense but before withdrawal became effective, on July 28, 2017, Plaintiffs' counsel sent a "re-tender of defense" letter to Linda Wendell Hsu, coverage counsel for Nautilus, contending that the deposition testimony of Jacqueline Weide, Ted Switzer, and Dixie Switzer triggered the duty to defend (the "First Re-Tender"). (ECF No. 404 at 9.)

42.    Along with the First Re-Tender, Plaintiffs' counsel provided Nautilus select pages of the deposition testimony that they believed triggered a duty to defend. (ECF No. 416 at 16.)

43.    Hsu reviewed the selected deposition testimony and concluded that it did not match up with the representations made in the First Re-Tender. (*Id.* at 17.) Hsu asked her associate Jen Wahlgren to obtain complete copies of the relevant deposition transcripts so that she could fully and properly investigate the First Re-Tender. (*Id.* at 17-18.) Wahlgren obtained them from defense counsel. (*Id.* at 18; Ex. 76 at 5.)

44.    Nautilus denied coverage under the First Re-Tender on August 10, 2017. (ECF No. 404 at 9.)

45.    In the letter denying coverage, Hsu explained that the proffered deposition testimony did not support the inference or conclusion that the Weide Email was false, as required to allege a claim of slander, libel, or disparagement under California law, and therefore, it "fails to evidence a claim potentially covered under the Policy" and "Nautilus has no duty to defend or indemnify." (Ex. 76 at 3, 4-5). The letter also relied on Judge Dorsey's order granting Nautilus's motion for partial summary judgment in the Coverage Action. (*Id.* at 3-4.)

46.    In recommending denial of the First Re-Tender, Hsu had also considered Switzer's counsel's prior conversation with her in which he stated that Switzer and counsel were not making a covered claim, did not want Nautilus to defend Plaintiffs, and had tried to plead the allegations in the Switzer Cross-Complaint around insurance coverage. (ECF No. 416 at 22-24.)

47.     Nautilus approved the letter denying the First Re-Tender. (Ex. 198 at 4.)

**I.     Settlement Discussions and Coverage Action Ruling Between First and Second Re-Tenders**

48.     On the same day as the First Re-Tender, Phillips sent a letter to Hsu stating that Welke had informed him that she could get the Switzer Cross-Complaint settled between $600,000 to $800,000. (Ex. 139 at "Exhibit O.")[4]

49.     After Hsu received that letter, either she or her associate contacted Phillips, and she determined that what was represented in his letter was not accurate. (ECF No. 416 at 48.) Hsu learned that the $600,000 to $800,000 numbers were based on Welke's recommendation as to settlement value in a pre-mediation report and that Welke had not conveyed a settlement opportunity in that range. (*Id.* at 54.) Welke also testified that she does not recall discussing that settlement range in her pre-mediation report with Phillips at any point. (ECF No. 415 at 30.)

50.     On August 4, 2017, Phillips sent Hsu an email representing that Switzer made a $1 million settlement demand and that Plaintiffs were still willing to contribute $500,000 to such a settlement. (Ex. 174 at 2.) At Trial, Phillips testified that he wrote the email because Switzer's counsel Gregory Altounian had conveyed a settlement demand for $1 million. (ECF No. 414 at 33-34.)

51.     After Hsu received that email, either she or her associate contacted Phillips and learned that the representation that there had been a $1 million settlement demand by Switzer was not accurate. (ECF No. 416 at 53-55.) Hsu learned instead that Plaintiffs wanted to make a $1 million settlement offer and that the last settlement demand made by Switzer was $1.9 million. (*Id.* at 55.) This appears consistent with a claims note dated August 9, 2017 indicating that "Insured has made his last offer of $1M over 10 years – [Switzer] responded with $1.9M." (Ex. 173 at 2.)

---

[4]Exhibit O is an exhibit hyperlinked in a transcript of a December 23, 2020 deposition of Wood. (Ex. 139 at 5.)

52.     On August 11, 2017, Hsu sent a letter to Phillips addressing that the representation that there had been a $1 million settlement demand was not accurate. (Ex. 227 at 3.) Phillips never responded to the letter. (ECF No. 416 at 59-60.) It is possible that the letter was sent to the wrong email address. (*Id.* at 96-97.)

53.     Consistent with Hsu's testimony and inconsistent with Phillips's testimony, in his December 23, 2020 deposition, Wood had testified that the lowest and last formal settlement demand he received from Switzer was $1.9 million. (Ex. 139 at 92-93.) Along the same lines, Welke testified at Trial that, in August 2017, Switzer did not convey to her a formal settlement demand of $1 million. (ECF No. 415 at 72-73.)

54.     Given this evidence, the Court finds that Phillips's testimony at Trial that there was a settlement demand for $1 million from Switzer (ECF No. 414 at 33-34, 105) is not credible.

55.     In considering settlement, Nautilus also took into consideration that Switzer's demands for money were based on all of his claims and not only any allegedly covered claims. (ECF No. 416 at 60-61.) And in fact, according to Hsu, Nautilus was consistently apprised that Switzer's demands were not based on any potentially covered defamation claim. (*Id.*)

56.     During the pendency of the appeal in the Coverage Action, on August 8, 2017, Plaintiffs requested consideration of their motion for relief from Judge Dorsey's summary judgment order based on the deposition testimony identified in the First Re-Tender. *See Nautilus Insurance Company v. Access Medical, LLC et al.*, Case No. 2:15-cv-00321-JAD-BNW, ECF No. 117 (D. Nev. Filed August 8, 2017).

57.     The day after Nautilus denied the First Re-Tender, on August 11, 2017, Judge Dorsey denied Plaintiffs' request for consideration of their motion for relief from judgment, determining that the motion relied on evidence outside the scope of the operative complaint and that, in any event, the deposition testimony probably does not trigger coverage. (Ex. 183 at 4-5.)

1

### J.     Second Re-Tender: Voir Dire

2          58.     On August 24, 2017, two days into the Switzer Action jury trial, Plaintiffs'

3   counsel emailed Hsu, asserting that questions asked during voir dire at the trial triggered

4   a duty to defend (the "Second Re-Tender"). (ECF No. 404 at 9.) The trial transcript

5   contained several lines of questions that Switzer's counsel asked of potential jurors,

6   including "has anybody ever said anything about you that was false?" and "anybody else

7   have an experience like that where somebody said something about them that wasn't

8   true?" (*Id.*)

9          59.     As part of its investigation of the Second Re-Tender, Nautilus had Hsu as

10  coverage counsel provide her analysis of whether there was a duty to defend based on

11  questions asked during voir dire. (ECF No. 415 at 146.)

12         60.     Hsu evaluated the Second Re-Tender and searched for case law that

13  addressed whether or not questions asked during voir dire would trigger a duty to defend.

14  (ECF No. 416 at 27.) She found nothing directly on point but did find case law indicating

15  that "it is not the function of voir dire to educate the jury about particular facts of the case

16  or to argue the case." (*Id.* at 27-28.)

17         61.     On August 31, 2017, Hsu on behalf of Nautilus sent a letter to Plaintiffs

18  denying coverage for the Second Re-Tender. (ECF No. 404 at 9; Ex. 80.)

19         62.     In the letter denying the Second Re-Tender, Hsu informed Plaintiffs that the

20  function of voir dire is not to educate the jury about facts or argument, and therefore,

21  "statements made by Mr. Switzer's counsel during voir dire should not be equated as

22  evidence or allegations made by Mr. Switzer in the Underlying Action." (Ex. 80 at 1.) Hsu

23  also stated that even if statements made during voir dire were to be considered as

24  evidence of Switzer's allegations, the "questions to the jury [at issue] do not meet the

25  definition of a disparagement claim as defined by California law" because "[f]or example,

26  there is no evidence that the Insureds made any derogatory statements about Mr.

27  Switzer."  (*Id.* at 1-2.)

28

63.     Nautilus approved the response to the Second Re-Tender. (ECF No. 416 at 43.)

**K.     Third Re-Tender: Dixie Switzer's Trial Testimony**

64.     On September 19, 2017, Plaintiffs' counsel re-tendered their request for defense to Nautilus based on the trial testimony of Switzer's wife, Dixie Switzer, which Plaintiffs argued provided an indication that the Weide Email was false (the "Third Re-Tender"). (ECF No. 404 at 9.)

65.     The testimony at issue included the question, "But in fact, Alphatec had terminated Omega's contract; correct?" Ms. Switzer responded, "But we could still sell the product." (*Id.*)

66.     As part of Nautilus's investigation of the Third Re-Tender, Nautilus had Hsu as its coverage counsel provide an analysis of whether there was a duty to defend based on Ms. Switzer's trial testimony. (ECF No. 415 at 149.) In Hsu's investigation of the Third Re-Tender, she evaluated Ms. Switzer's trial testimony and looked back at her deposition testimony. (ECF No. 416 at 30.)

67.     On September 26, 2017, Hsu sent a letter to Plaintiffs, informing them that Nautilus was denying the Third Re-Tender. (ECF No. 404 at 9-10; Ex. 83.)

68.     When evaluating the Third Re-Tender, Hsu considered Judge Dorsey's August 11, 2017 order in the Coverage Action denying Plaintiffs' request for consideration of their motion for relief from judgment, which reiterated the elements of a disparagement claim under California law as being required to establish potential coverage. (ECF No. 416 at 31-34.)

69.     In the letter denying the Third Re-Tender, Hsu stated that Ms. Switzer's testimony did not "meet the definition of disparagement as defined under California law" because it did not "describe a statement that specifically refers to her or her business that clearly derogates her business." (Ex. 83 at 2.) Hsu also noted that the testimony did not "expressly refer" to the Weide Email nor indicate that Switzer was making a defamation claim in the Switzer Cross-Complaint. (*Id.*)

70.     Nautilus approved the response to the Third Re-Tender. (ECF No. 416 at 43.)

**L.     Fourth Re-Tender: Weide and Switzer's Trial Testimony**

71.     On September 27, 2017, Plaintiffs' counsel re-tendered their request for defense based on trial testimony of Jacquie Weide and Ted Switzer ("Fourth Re-Tender"). (ECF 404 at 10.) Weide had testified that "the distributor that [she] was referring to [in the email] . . . was Ted Switzer." (*Id.*) And Switzer had testified that "Alphatec doesn't take inventory back; so I already had a million dollars worth of inventory, but I had the rights to sell that inventory." (*Id.*)

72.     As part of Nautilus's investigation of the Fourth Re-Tender, Nautilus had Hsu as coverage counsel provide an analysis of whether there was a duty to defend based on Weide's and Switzer's trial testimony. (ECF No. 415 at 149-50.)

73.     On October 10, 2017, Hsu on behalf of Nautilus sent a letter to Plaintiffs denying coverage for the Fourth Re-Tender. (ECF No. 404 at 10; Ex. 88.)

74.     In determining that there was no duty to defend based on the Fourth Re-Tender, Hsu relied on Judge Dorsey's orders in the Coverage Action and concluded that the trial testimony was similar to the deposition testimony that Judge Dorsey's August 11, 2017 order had stated likely did not trigger a duty to defend. (ECF No. 416 at 36-37; Ex. 88 at 1-3.)

75.     Nautilus approved the response to the Fourth Re-Tender. (ECF No. 416 at 43.)

**M.     Fifth Re-Tender: Jury Instructions**

76.     On October 2, 2017, Plaintiffs' counsel emailed Hsu, contending that statements made to the court in the Switzer Action by Switzer's counsel about a proposed jury instruction on false representation were further proof that Nautilus owed a duty to defend ("Fifth Re-Tender"). (ECF No. 404 at 10; Ex. 87.)

77.     At trial in the Switzer Action, Switzer's counsel proposed a jury instruction on false representation, and when the court asked what evidence there was of false

16

representation, Switzer's counsel said, "And then also the—the representations that were made by Ms. Weide in all those e-mails that I was reading off." (Ex. 87.)

78.    On October 26, 2017, Hsu on behalf of Nautilus sent a letter to Plaintiffs denying coverage for the Fifth Re-Tender. (Ex. 89.)

79.    In Hsu's investigation of the Fifth Re-Tender, she obtained and reviewed a list of the jury instructions submitted to the court. (*Id.* at 1.)

80.    In the response to the Fifth Re-Tender, Hsu noted that Switzer's counsel did not request a jury instruction for defamation and that the proposed jury instruction at issue was for Switzer's claim for intentional misrepresentation. (*Id.*; ECF No. 416 at 39-40.)

81.    Nautilus approved the response to the Fifth Re-Tender. (ECF No. 416 at 43.)

**N.    Switzer Action Trial and Jury Verdict**

82.    Plaintiffs were represented by law firms Gordon Rees (through counsel David Jones and Eleanor Welke) and Wild, Carter & Tipton (through counsel John Phillips) at the Switzer Action trial. (Ex. 9 at 2.)

83.    Phillips attended trial daily and participated in jury selection, bench conferences, and hearings during trial. (ECF No. 414 at 58-61.) Phillips also communicated directly with Wood during the trial and ensured Wood's independent interests were protected. (ECF No. 415 at 62; ECF No. 414 at 70.)

84.    The Gordon Rees attorneys directly handled the trial work, including witness examinations, opening and closing arguments, motion work, hearings, voir dire, and jury instructions. (ECF No. 415 at 61-62; ECF No. 414 at 57-60.)

85.    At the Trial, Phillips testified that he was satisfied with Jones and Welke's defense of Switzer, that they did a "good job" at trial, that they were "good trial lawyers", and that Plaintiffs were "in good hands with them." (ECF No. 414 at 70-71, 73.)

86.     Welke testified that she believed she and Jones "did a good job" at trial, including getting large portions of the claimed damages dismissed. (ECF No. 415 at 59-60.) Welke has had significant litigation experience since 2009. (*Id.* at 4.)

87.     According to Jones, who was lead trial counsel (ECF No. 415 at 60), Nautilus's withdrawal of defense had "no effect at all" on the work he and the Gordon Rees trial team did on behalf of Plaintiffs in the Switzer Action (ECF No. 417 at 7-8, 10). Jones has practiced civil litigation since 1983 (*id.* at 4) and, by the start of the Switzer Action, had tried over 30 cases, nine or 10 of which to verdict (*id.* at 5). Jones handled jury selection, opening statement, and almost all witness examinations. (*Id.* at 9.) Jones believed that the case was "clean and well tried," he did not "second guess anything that was done during the course of the trial," and he put on the best trial he could. (*Id.* at 12-14.)

88.     Jones testified that the trial was "complex" (ECF No. 417 at 15), and Welke similarly testified that the Switzer Action involved "complicated financial relationships," "a significant amount of analysis," and "a tremendous amount of documents" (ECF No. 415 at 19).

89.     On October 11, 2017, the jury returned a verdict against Plaintiffs. (Ex. 9 at 2-18.) In pertinent part, the verdict forms submitted to and answered by the jury in the Switzer Action concerned Switzer's claims for intentional misrepresentation and concealment arising out of statements that Wood or his agents made or failed to make to Switzer, not to third parties regarding the reputation of Switzer. (*Id.* at 3-4.) The jury was not asked to make a finding on a cause of action for interference with prospective economic advantage. (*See id. generally.*)

90.     On September 12, 2019, the "Final Statement of Decision and Judgment on Special Verdict – Modified After Appeal" was entered against Plaintiffs on the Switzer Cross-Complaint in the amount of $9,818,761.50 in damages. (ECF No. 404 at 10.) That amount included $6,761,588 in penalty damages under California Penal Code § 496(c). (Ex. 9 at 22.)

91.    Interest has been accruing on the judgment against Plaintiffs at 10% annually, or $2,690 per day, since September 12, 2019. (ECF No. 404 at 10.) Therefore, the judgment against Plaintiffs, including interest, is now around $14 million.

**O.    Attorney's Fees and Costs Incurred by the Parties**

92.    In pertinent part, Plaintiffs incurred the following attorney's fees and costs.

93.    Plaintiffs incurred $101,727.30 in expert costs from Hemming Morse, LLP after July 27, 2017 that were billed to Plaintiffs for the defense of the Switzer Action. (ECF No. 404 at 11.)

94.    Wild, Carter, & Tipton invoiced Plaintiffs $120,045.85 in total fees and costs for the Switzer Action. (*Id.*)

95.    Gordon Rees invoiced Plaintiffs $500,020.83 from August 1, 2017 onwards for the Switzer Action. (*Id.* at 12.)

96.    Plaintiffs incurred $26,915.00 in attorneys' fees from The Schnitzer Law Firm for prosecuting the instant action. (ECF No. 404 at 11.) Plaintiffs claim they switched to a contingency fee after those hourly fees were incurred. (*Id.*)

97.    Under its unjust enrichment counterclaim, Nautilus is requesting reimbursement of $829,537.36 from Plaintiffs, which includes the following fees and costs incurred between February 25, 2015 and July 27, 2017 for the Switzer Action. (ECF No. 420 at 49.)

98.    From February 25, 2015 until Wolfe & Wyman was replaced as defense counsel in April 2016, Nautilus paid $89,924.54 to Wolfe & Wyman for the law firm's work on behalf of Plaintiffs for the Switzer Cross-Complaint. (ECF No. 404 at 6.)

99.    Through July 27, 2017, Nautilus paid $425,546.77 to Gordon Rees for work on behalf of Plaintiffs for the Switzer Cross-Complaint. (*Id.* at 6-7.) Nautilus is not seeking reimbursement of fees it paid Gordon Rees that were incurred between March 30, 2016 to May 31, 2016, which totals $47,207.59. (*Id.* at 12; ECF No. 420 at 23.) Therefore, the total amount that Nautilus is seeking in reimbursement for Gordon Rees's fees is $378,339.18. (ECF No. 420 at 23; *compare* ECF No. 404 at 6-7 *with id.* at 12.)

19

100.    Nautilus claims it paid $129,261.91 to Wild, Carter & Tipton for the law firm's work through July 27, 2017 on behalf of Plaintiffs for the Switzer Cross-Complaint. (ECF No. 420 at 23.) But the Court could only verify Nautilus's payment of $126,414.76 to Wild, Carter & Tipton for its services through July 27, 2017. (Ex. 208 at 2-7 (adding up cleared check payments issued to Wild, Carter & Tipton between December 3, 2015 and August 10, 2017); Ex. 202 at 82 (subtracting amounts invoiced after July 27, 2017 from the August 10, 2017 issued check amount).)

101.    Between February 25, 2015 and July 27, 2017, Nautilus paid the following third-party vendor costs directly for the defense of Plaintiffs for the Switzer Cross-Complaint:

   a.    Hemming Morse LLP, Forensic Accountant, $197,024.22;

   b.    Dowling Aaron Incorporated, Discovery Facilitator, $2,960.00;

   c.    JAMS, Inc., Mediation, $1,500;

   d.    LA Best Color Imaging, Printing Services, $2,869.63;

   e.    Berkley Court Reporters Inc., Court Reporter, $21,980.89;

   f.    Aptus Court Reporting, Court Reporter, $1,294.84;

   g.    Wood & Randall, Expert Services, $1,120.20;

   h.    Sean D. Early MD, Expert Services, $2,250.00; and

   i.    IFY Travel & Tours Inc., Travel Services, $1,011.95

(ECF No. 404 at 7.)

## IV.    CONCLUSIONS OF LAW

The Court addresses the parties' claims in the following order: Plaintiffs' damages caused by Nautilus's breach of the contractual duty to defend; Plaintiffs' claim for breach of the contractual duty to pay reasonable costs of independent counsel; Plaintiffs' bad faith claims; Plaintiffs' claims for violations of Nevada's Unfair Claims Practices Act; and Nautilus's counterclaim for unjust enrichment.

**A.** **Breach of Contract**

    **1.** **Damages for Breach of Contractual Duty to Defend**

1.    The Court previously found that Plaintiffs had demonstrated liability on their claim for breach of the contractual duty to defend, but the issue of damages caused by that breach remained for trial. (ECF No. 315 at 24, 40.) Plaintiffs primarily argue that they are entitled to an award in the amount of the Switzer Action judgment, plus interest—an amount now around $14 million. (ECF No. 419 at 73, 117.)

2.    Under the Court's summary judgment ruling, Nautilus's duty to defend was triggered on July 28, 2017, when Plaintiffs submitted the First Re-Tender based on newly discovered evidence that raised the potential for coverage under the personal and advertising injury provisions of the Policy.[5] (ECF No. 315 at 22-23.) Because Nautilus's duty to defend was triggered on July 28, 2017, Nautilus breached the contractual duty to defend when it withdrew its defense of Plaintiffs for the Switzer Cross-Complaint on August 1, 2017 and denied Plaintiffs' subsequent re-tenders. (*Id.* at 24.)

3.    "[A]n insured may recover any damages consequential to the insurer's breach of its duty to defend[;] [a]s a result, an insurer's liability for the breach of the duty to defend is not capped at the policy limits, even in the absence of bad faith." *Century Surety Co. v. Andrew*, 432 P.3d 180, 186 (Nev. 2018). "However, [this does not mean] that an entire judgment is automatically a consequence of an insurer's breach of its duty to defend; rather, the insured is tasked with showing that the breach caused the excess judgment and 'is obligated to take all reasonable means to protect himself and mitigate his damages.'" *Id.*

4.    "The determination of [damages] depends on the unique facts of each case and is one that is left to the [factfinder]'s determination." *Id.* (citing *Khan v. Landmark Am. Ins. Co.*, 757 S.E.2d 151, 155 (Ga. 2014) ("[W]hether the full amount of the judgment was

---

[5]Plaintiffs continue to argue that Nautilus's duty to defend was triggered even earlier on September 23, 2016. (ECF No. 419 at 89.) The Court does not consider these re-hashed arguments on issues already decided.

recoverable was a jury question that depended upon what damages were found to flow from the breach of the contractual duty to defend.")).

5.      As to causation, courts have considered "whether the insured had as good of a defense as it would have had had the insurer provided counsel." *Century Surety Co.*, 432 P.3d at 185 (citing *Hamlin Inc. v. Hartford Acc. & Indem. Co.*, 86 F.3d 93, 95 (7th Cir. 1996)). For instance, in *Hamlin*, the court found that the entire judgment against the insured was not consequential to the insurer's breach of its duty to defend because the insured "couldn't have expected to do better than with" the firm it hired and the same judgment would have resulted even if the insurer defendants had covered all of his defense bills. *See* 86 F.3d at 95.

6.      "For an[other] example of when the breach of the duty to defend would not proximately cause an excess judgment, *see* [*Rogan v. Auto–Owners Ins. Co.*, 171 Ariz. 559, 832 P.2d 212, 217 (Ariz. Ct. App.1991)] [,] stating there is no causal connection between the breach of the duty to defend and an excess judgment where the insured defends itself because '[g]iven competent counsel to represent the insured, the judgment would be the same as if the defense had been conducted by the insurer's counsel.'" *Andrew v. Century Sur. Co.*, 134 F. Supp. 3d 1249, 1259 n.2 (D. Nev. 2015).

7.      Here, Nautilus withdrew its defense on August 1, 2017 and stopped paying Plaintiffs' defense costs incurred after that date. Gordon Rees filed a motion to withdraw as counsel for Plaintiffs shortly after Nautilus's withdrawal, but the motion was denied. Plaintiffs therefore continued to retain Gordon Rees to represent them on the Switzer Cross-Complaint after August 1, 2017 and through trial.

8.      By all indications, Gordon Rees's defense of Plaintiffs through the Switzer Action trial was thorough, skilled, in conformance with its professional responsibilities, conducted without regard to who was paying, and represented Gordon Rees's best efforts. Trial testimony from Phillips, Welke, and Jones confirms as much. The Court therefore finds that Gordon Rees's defense was no different than it would have been had Nautilus continued to pay for the defense.

9.     In contrast to *Century Surety Co.*, 432 P.3d at 182, where default judgment was entered against the insured as a result of the insurer not providing the insured a defense in the first instance, here, after August 1, 2017, Plaintiffs continued to retain the same defense counsel that Nautilus had been paying before it withdrew its defense. In addition, after August 1, 2017, Plaintiffs continued to retain the same independent counsel that Nautilus had been paying before it withdrew its defense.

10.    The Court cannot conclude that Plaintiffs received a lesser defense from Gordon Rees and Wild, Carter, & Tipton simply because Nautilus was no longer funding the defense. Plaintiffs have presented no evidence, let alone shown by a preponderance of the evidence, that Nautilus's nonpayment of defense costs after August 1, 2017 resulted in a change of strategy, effort, or the like that resulted in a worse result at trial for Plaintiffs. If Nautilus had continued paying the defense, Plaintiffs would have benefited only from Nautilus's payment of defense costs but nothing more monetarily. *See Hamlin*, 86 F.3d at 95. According to the jury verdict, the judgment is directly attributable to Plaintiffs' own fraudulent conduct and would not have been different had Nautilus continued paying for the defense.

11.    Accordingly, the Court finds that Nautilus is not liable for the judgment rendered against Plaintiffs in the Switzer Action because its breach of the contractual duty to defend did not cause the judgment.

12.    In any event, for public policy reasons, Plaintiffs cannot recover from Nautilus the penalty damages awarded against them under California Penal Code § 496(c), which collectively amount to $6,761,588 of the total judgment.

13.    California Penal Code § 496(a) makes it a criminal offense for a "person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained." Cal. Penal Code § 496(a) (West).

14.     California Penal Code § 496(c) provides that the victim can recover "three times the amount of actual damages." Cal. Penal Code § 496(c) (West). These "[t]reble damages are punitive in nature[.]" *Imperial Merch. Servs., Inc. v. Hunt*, 212 P.3d 736, 744 (Cal. 2009).

15.     "The Nevada Supreme Court clearly prohibits, on grounds of public policy, indemnification for punitive damages." *Lombardi v. Maryland Cas. Co.*, 894 F. Supp. 369, 372 (D. Nev. 1995) (citing *Siggelkow v. Phoenix Ins. Co.*, 846 P.2d 303 (Nev. 1993) and other Nevada Supreme Court cases). Punitive damages are designed "to punish and deter oppressive, fraudulent or malicious conduct." *Siggelkow*, 846 P.2d at 304. To effectuate this goal, "it is incumbent upon the party whose conduct was so outrageous as to merit punishment by means of punitive damages to bear the burden of paying the award." *New Hampshire Ins. Co. v. Gruhn*, 670 P.2d 941, 943 (Nev. 1983). "This policy would be thwarted if the tortfeasor is able to skirt the award by passing the liability on to a surety." *Id.* Therefore, "the wrongdoer must pay a punitive damage award, not the insurer." *Lombardi*, 894 F. Supp. at 372.

16.     In addition to lack of causation as discussed above, the Court also finds that the penalty damages portion of the judgment in the Switzer Action is not recoverable as damages for Nautilus's breach of its contractual duty to defend because Nevada law prohibits indemnification for punitive damages.

**2.     Breach of Duty to Pay Reasonable Costs for Independent Counsel**

17.     A subset of Plaintiffs' breach of contract claim is their argument that Nautilus failed to pay the reasonable costs of independent counsel. (ECF No. 419 at 102.) Plaintiffs argue that Nautilus improperly applied California law instead of Nevada law to justify its position that it was only responsible for paying independent counsel at the discounted panel rate. (*Id.*)

18.     Both Nevada and California are dual-representation states, meaning insurer-appointed counsel represents both the insurer and the insured. *State Farm Mut.*

*Auto. Ins. Co. v. Hansen*, 357 P.3d 338, 340-41 (Nev. 2015) (citing *Nev. Yellow Cab Corp. v. Eighth Judicial Dist. Ct.*, 152 P.3d 737, 742 (Nev. 2007), and *Unigard Ins. Grp. v. O'Flaherty & Belgum*, 38 Cal. App. 4th 1229, 1236-37 (2d Dist. 1995)). "But when an insurer provides counsel to defend its insured, a conflict of interest may arise because the outcome of litigation may also decide the outcome of a coverage determination—a determination that may pit the insured's interest against the insurer's." *State Farm Mut. Auto. Ins. Co. v. Hansen*, 357 P.3d 338, 340 (Nev. 2015). "Where the clients' interests conflict, the rules of professional conduct prevent the same lawyer from representing both clients." *Id.* at 341. In such a situation, "Nevada law requires the insurer to satisfy its contractual duty to provide representation by permitting the insured to select independent counsel and by paying the reasonable costs of such counsel." *Id.*

19.    In articulating this rule, the Nevada Supreme Court adopted the rule established by *San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 162 Cal. App. 3d 358 (4th Dist. 1984), construing the so-called "*Cumis* rule" as requiring "insurers to fulfill their duty to defend by allowing insureds to select their own counsel and paying the reasonable costs for the independent counsel's representation." *Hansen*, P.3d 338, 341. Post-*Cumis*, California codified its standard in Civil Code § 2860(c). *See United Enterprises, Inc. v. Superior Ct.*, 183 Cal. App. 4th 1004, 1010 (4th Dist. 2010). Section 2860(c) does not cap attorneys' fees, but rather limits the insurer's obligation "to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended." Cal. Civ. Code § 2860 (West).

20.    The duty to pay independent counsel arises from the duty to defend, *see Hansen*, 357 P.3d at 341, which is created by the Policy, *see Nautilus*, 482 P.3d at 687, which is here governed by Nevada law. Accordingly, Nevada law controls Nautilus's duties with regards to paying independent counsel when a conflict of interest arises.

21.    The Nevada rule articulated in *Hansen*—that the insurer is required to pay "reasonable" fees for independent counsel—is expressly derived from California's *Cumis*

1   rule. *See Hansen*, 357 P.3d at 341. But Nevada has not passed a statute such as

2   California Civil Code § 2860(c) and therefore does not appear to limit the insurer's

3   obligation to pay independent counsel at the rates of panel counsel.

4        22.    The Court accordingly finds that Nautilus was required to pay independent

5   counsel here at a rate that was reasonable for similar work in the jurisdiction and not

6   tethered to Nautilus's panel counsel rates.

7        23.    The parties stipulated that the hourly billing rates of defense counsel Wolfe

8   & Wyman and Gordon Rees were reasonable and within market rates for the legal work

9   performed. (ECF No. 404 at 7.) For defense of the Switzer Cross-Complaint, Wolfe &

10  Wyman billed at the rate of $170 per hour, and Gordon Rees billed at the rate of $265 to

11  $285 per hour.[6] (*Id.* at 6.)

12       24.    When first hired as independent counsel, Phillips's standard rate was $285

13  per hour. (ECF No. 414 at 11-12.)

14       25.    To determine the reasonable value of an attorney's services, Nevada courts

15  consider: "(1) the qualities of the advocate: [their] ability, [their] training, education,

16  experience, professional standing and skill; (2) the character of the work to be done: its

17  difficulty, its intricacy, its importance, time and skill required, the responsibility imposed

18  and the prominence and character of the parties where they affect the importance of the

19  litigation; (3) the work actually performed by the lawyer: the skill, time and attention given

20  to the work; (4) the result: whether the attorney was successful and what benefits were

21  derived." *Brunzell v. Golden Gate Nat. Bank*, 455 P.2d 31, 33 (Nev. 1969).

22       26.    As of the Trial, Phillips had over 30 years of experience as a practicing

23  attorney (ECF No. 414 at 11), so at the time he became involved as independent counsel

24  in 2015 (*id.* at 106), he had at least 22 years of experience.

25

26

27       [6]Plaintiffs claim that after Nautilus withdrew litigation funding, Gordon Rees's rates
increased and Plaintiffs were charged the reasonable market rate of $365 per hour for an
28  associate and $385 per hour for a partner. (ECF No. 419 at 106-07.) However, to support
this contention, Plaintiffs cite only to unadmitted evidence (ECF No. 419 at 83 n.18) that
the Court cannot—and does not—consider.

27.     Phillips represented Plaintiffs in the Switzer Action from July 2015 to October 2017. (*Id.*; ECF No. 404 at 12 (last invoice dated November 1, 2017).) During that time, he directly communicated with Wood and participated in settlement discussions, mandatory settlement conferences, hearings, and depositions. (ECF No. 414 at 15, 49-51, 75, 88; ECF No. 415 at 32, 62.) He also discussed, planned, and prepared defense strategies with defense counsel. (ECF No. 414 at 55, 61.) He attended trial daily and participated in jury selection and bench conferences during trial. (*Id.* at 58-60.) The Court finds the extent of Phillips's participation in the Switzer Action consistent with his role as independent counsel.

28.     Both parties agree that the Switzer Action was complex. (ECF No. 419 at 108; ECF No. 420 at 52.) The Switzer Action was a dispute among business partners over the operations of their limited liability company that sold medical implants to hospitals in various states and involved over 30 causes of action. Several witnesses testified to the complexity of the matter. For instance, Welke testified that the matter involved "complicated financial relationships" and "a tremendous amount of documents" requiring "a significant amount of analysis." (ECF No. 415 at 19.)

29.     Each attorney involved in the defense, including independent counsel, expended a significant amount of time and effort commensurate with the importance and complexity of the matter. Independent counsel in particular provided the benefit of direct communications with Wood and of ensuring Plaintiffs' interests were protected. (ECF No. 415 at 62; ECF No. 414 at 70.)

30.     Nautilus argues that after it withdrew its defense on August 1, 2017, there was no longer a conflict of interest and therefore no longer an entitlement to independent counsel. (ECF No. 420 at 13.) The Court is not persuaded by this argument because it previously found that Nautilus had a duty to defend as of July 28, 2017. Therefore, after July 28, 2017, Nautilus should have continued to retain and direct defense counsel, which would have given rise to a conflict of interest, and should have continued to pay the reasonable costs of independent counsel.

31.     Based on Phillips's experience and skill, the complexity of the *Switzer* Action, the work performed by independent counsel, and the benefits derived from the work, the Court finds that Phillips's standard $285 per hour rate at the time of the *Switzer* Action was reasonable—especially in a context in which Gordon Rees was paid $285 per hour. Under Nevada law, Nautilus should have paid Phillips that rate, instead of limiting his rate to its initial $170 per hour panel counsel rate and requiring Plaintiffs to pay the remaining $115 per hour. Nautilus therefore breached its contractual duty to pay the reasonable costs of independent counsel.

32.     The parties stipulated that Wild, Carter, & Tipton invoiced Plaintiffs $120,045.85 in total fees and costs for the Switzer Action. (ECF No. 404 at 11.) From a review of Wild, Carter, & Tipton's invoices to Nautilus (ECF No. 202), which include the same time and services billed to Plaintiffs (ECF No. 414 at 16) through August 11, 2017, the Court finds that those billed fees and costs were reasonable and necessary.[7] Phillips testified that the total amount of $120,045.85 accurately reflects the legal work he completed for which he invoiced Plaintiffs. (*Id.* at 15.) Weide testified that she reviewed the bills for independent counsel fees and costs on behalf of Plaintiffs and resolved any needed adjustments to those bills. (ECF No. 415 at 194-95.)

33.     The Court accordingly finds that the stipulated total amount was reasonable and necessary based on the evidence. Plaintiffs are therefore entitled to damages in the amount of $120,045.85 for the fees and costs of independent counsel that Plaintiffs incurred and that Nautilus was required to pay.[8]

---

[7]The Court reviewed the descriptions of work noted on Nautilus's invoices and finds that they are consistent with Phillips's role as independent counsel in the Switzer Action. Among other reasons, the Court did not admit Plaintiffs' invoices from Wild, Carter, & Tipton at the Trial because the descriptions of work on them had been redacted. (ECF No. 414 at 17-18.)

[8]Plaintiffs argue that another subset of their breach of contract claim is the contention that Nautilus breached its duty to settle. (ECF No. 419 at 91.) However, Plaintiffs' relevant cited case law indicates this duty to settle is an implied duty of good faith and fair dealing. (*Id.* at 91-93.) These arguments are therefore more appropriately addressed under Plaintiffs' bad faith claim for failure to settle. In fact, Plaintiffs' operative complaint (ECF No. 73 at 18) alleges that Nautilus had "settlement duties as set forth in

### 3.  Other Damages for Breach of Contract

34.  Aside from the amount of the Switzer Action judgment and fees and costs of independent counsel, Plaintiffs also argue that they are entitled to other attorney's fees and costs related to defense of the Switzer Action, attorney's fees and costs incurred in this instant action, and emotional distress damages of $15 million. (ECF No. 419 at 119-20.)

### a.  Defense Costs for Switzer Action

35.  Plaintiffs argue they are entitled to an award of $500,020.83 for attorney's fees and costs Plaintiffs incurred from Gordon Rees after August 1, 2017. (*Id.* at 120; ECF No. 404 at 12.) It is undisputed that the Switzer Action was complex, the Gordon Rees defense counsel were experienced, and their hourly rates were reasonable. But as to the reasonableness and necessity of the specific fees and costs billed, Plaintiffs merely argue that they fall within the projected litigation budget, as set forth in the pre-mediation evaluation report, which Nautilus purportedly never questioned. (ECF No. 419 at 83.) Plaintiffs also cite to Weide's testimony that she reviewed the bills from Gordon Rees (*id.* at 120), but Plaintiffs have never proffered admissible, unredacted copies of these bills for the Court's review. This is insufficient for the Court to determine whether these claimed attorney's fees and costs were reasonable and necessary. The Court therefore cannot and does not award Plaintiffs the amount of Gordon Rees's defense fees and costs incurred after August 1, 2017.

36.  Next, Plaintiffs request and Nautilus concedes that Plaintiffs should be awarded $101,727.30 for the reasonable expert fees Plaintiffs incurred from Hemming Morse, LLP after August 1, 2017. (*Id.*; ECF No. 420 at 31, 55; ECF No. 404 at 11.) The Court therefore awards Plaintiffs $101,727.30 for these reasonable expert fees.

---

*Allstate v. Miller*, 212 P.3d 318, 323 (Nev. 2009)," which considered failure to fulfill settlement duties as constituting bad faith, *see id.* at 322. The Court therefore only addresses Plaintiffs' arguments regarding settlement under their bad faith claim further below.

### b.    Attorney's Fees for Instant Action

37.    As for attorney's fees incurred in the instant action, Plaintiffs argue they are entitled to $26,915.00 in attorneys' fees incurred from The Schnitzer Law Firm, as well as attorney's fees in the amount of a 40% contingency fee. (ECF No. 419 at 119-20.) Nautilus counters that Plaintiffs' claims for such attorneys' fees is not permissible under Nevada law, specifically under *Pardee Homes of Nevada v. Wolfram*, 444 P.3d 423 (Nev. 2019). (ECF No. 420 at 32-33.)

38.    "Nevada adheres to the American Rule that attorney fees may only be awarded when authorized by statute, rule, or agreement." *Pardee Homes*, 444 P.3d at 426. Nevada recognizes exceptions to this general rule, including awarding attorneys' fees as special damages in some cases. *Id.* Plaintiffs cite to *Sandy Valley Assocs. v. Sky Ranch Ests. Owners Ass'n*, 35 P.3d 964, 970 (Nev. 2001) as supporting their position (ECF No. 419 at 119-20), but the *Pardee Homes* court expressly noted that *Sandy Valley* "does not support an award of attorney fees as special damages where a plaintiff merely seeks to recover fees incurred for prosecuting a breach-of-contract action against a breaching defendant"—as is the case here. *Pardee Homes*, 444 P.3d at 426.

39.    To the extent Plaintiffs are arguing that *Sandy Lane* allows an award of attorney's fees where "the institution of the litigation was due to the activity of the defendant such that the plaintiff had to retain counsel and expend fees to pay for the litigation" (ECF No. 419 at 119-20), the Court finds that unpersuasive as the *Sandy Lane* court stated "the mere fact that a party was forced to file or defend a lawsuit is insufficient to support an award of attorney fees as damages," 35 P.3d at 970. Plaintiffs make no argument that it meets any of the three exceptions to the general rule outlined by *Sandy Valley* and *Pardee Homes*,[9] and the Court finds that none of the exceptions apply here.

---

[9]The three exceptions are as follows. "First, cases when a plaintiff becomes involved in a third-party legal dispute as a result of a breach of contract or tortious conduct by the defendant. Second, cases in which a party incurred the fees in recovering real or personal property acquired through the wrongful conduct of the defendant or in clarifying or removing a cloud upon the title to property. Third, injunctive or declaratory relief actions compelled by the opposing party's bad faith conduct." *Pardee Homes*, 444 P.3d at 426

40.   The Court accordingly finds that Plaintiffs are not entitled to an award of attorney's fees and costs incurred for the breach of contract claim in this case.

### c.   Emotional Distress Damages

41.   Lastly, as for Plaintiffs' request for $15 million in emotional distress damages, Plaintiffs only argue in conclusory fashion that "Wood has suffered emotional distress, humiliation, stress, and anxiety" and therefore is entitled to an award for emotional distress damages that is "no less than the accumulated total of interest on the Switzer judgment." (ECF No. 419 at 116.) Plaintiffs' emotional distress damages as a result of Nautilus's breach of contract are not pled with any level of specificity or certainty and are not reasonably tied to the interest that has accumulated on the judgment that the Court has already found was not caused by the breach of contract. Because Plaintiffs have not met their burden to demonstrate these emotional distress damages, the Court does not award them.

### B.   Bad Faith

42.   Plaintiffs claim that Nautilus committed bad faith for its failure to investigate the pre-mediation evaluation report, failure to investigate and denial of the Re-Tenders, and failure to settle. (ECF No. 419 at 142, 147, 149, 155, 165.)

43.   "Although every contract contains an implied covenant of good faith and fair dealing, an action in tort for breach of the covenant arises only 'in rare and exceptional cases' when there is a special relationship between the victim and tortfeasor." *Ins. Co. of the W. v. Gibson Tile Co.*, 134 P.3d 698, 702 (Nev. 2006); *see also Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009) ("The law, not the insurance contract, imposes [the implied covenant of good faith and fair dealing] on insurers"). The relationship between an insurer and its insureds is one such special relationship. *Ins. Co. of the West*, 134 P.3d at 702.

n.3 (internal citations and quotation marks omitted); *see also Sandy Valley*, 35 P.3d at 970.

44.     "A violation of the covenant gives rise to a bad-faith tort claim." *Allstate*, 212 P.3d at 324. "To prevail on such a claim, a plaintiff must [prove] that (1) an insurer-insured relationship exists; (2) the insurer breached its duty by refusing to defend or indemnify its insured for a loss covered by the policy; and (3) the denial is without proper cause, meaning the insurer has an 'actual or implied awareness of the absence of a reasonable basis for denying the benefits of the policy.'" *Arizona Civ. Constructors, Inc. v. Colony Ins. Co.*, 481 F. Supp. 3d 1141, 1151 (D. Nev. 2020) (quoting *Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1354-55 (Nev. 1986)).

45.     In other words, "[b]ad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct." *Guar. Nat. Ins. Co. v. Potter*, 912 P.2d 267, 272 (Nev. 1996). "It is not enough to show that, in hindsight, an insurer acted unreasonably; the plaintiff must show that the insurer knew or recklessly disregarded that it was acting unreasonably." *Fernandez v. State Farm Mut. Auto. Ins. Co.*, 338 F. Supp. 3d 1193, 1200 (D. Nev. 2018); *see also Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998) ("[T]he plaintiff must establish that the insurer had no reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage.").

### 1.     Failure to Investigate Pre-Mediation Evaluation Report

46.     Plaintiffs argue that Nautilus failed to properly investigate relevant information in the September 23, 2016 pre-mediation evaluation report. (ECF No. 419 at 147.)

47.     "Tactics such as an unreasonable failure to investigate . . . can give rise to an inference of bad faith." *Sierzega v. Country Preferred Ins. Co.*, 650 F. App'x 388, 389 (9th Cir. 2016) (citing Nevada Supreme Court cases). But "the failure to investigate is not itself bad faith." *Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 863 F. Supp. 1237, 1249 (D. Nev. 1994); *see also Hart v. Prudential Prop.*

& *Cas. Ins. Co.*, 848 F. Supp. 900, 905 n.4 (D. Nev. 1994) ("[U]nder the common law, a failure to investigate merely impacts the reasonableness of the denial.").

48.     Plaintiffs specifically argue that Nautilus's failure to contact Welke regarding her analysis of the Weide Email and failure to contact Weide herself about the email shows that Nautilus did not conduct an adequate investigation. (ECF No. 419 at 148.) Nautilus counters that it did not act in bad faith with respect to investigating coverage when it received Welke's pre-mediation evaluation report on September 23, 2016 because that letter did not reasonably require any action by an insurer that had no duty to defend at the time. (ECF No. 420 at 38.)

49.     The Court ultimately agrees with Nautilus because a bad faith claim requires that "the insurer breached its duty by refusing to defend or indemnify its insured for a loss covered by the policy." *Arizona Civ. Constructors*, 481 F. Supp. 3d at 1151. The Court previously found that Nautilus's duty to defend was triggered on July 28, 2017. Therefore, the Court need not decide the reasonableness of Nautilus's purported failure to investigate the pre-mediation report further to find that Nautilus's denial of the duty to defend with regards to the September 28, 2016 report was reasonable. Nautilus thus did not commit bad faith for failing to investigate the pre-mediation evaluation report and continuing to deny its duty to defend based on that report.

### 2.     Investigation and Denial of Re-Tenders

50.     Plaintiffs argue that Nautilus failed to promptly investigate and knowingly rejected the Re-Tenders without any reasonable basis. (ECF No. 419 at 149, 155.) "[F]ailure to investigate impacts the reasonableness of an insurer's denial of a claim" but "is not itself bad faith," so the Court considers the investigation and denial of the Re-Tenders together. *Pioneer Chlor Alkali Co.*, 863 F. Supp. at 1249.

51.     As an initial matter, the Court finds that Nautilus acted reasonably in utilizing and relying on its experienced coverage counsel, Linda Hsu, to assist it with investigating and evaluating each of the Re-Tenders.

**a.      First Re-Tender: Deposition Testimony**

52.      In investigating the First Re-Tender, Hsu determined that she needed complete copies of the deposition transcripts in order to evaluate Plaintiffs' proffered testimony and ultimately acquired them from defense counsel. The Court finds this course of action reasonable.

53.      In her analysis, Hsu relied on Judge Dorsey's summary judgment order (Ex. 76 at 3-4)—a final judgment that Nautilus owed Plaintiffs no duty to defend based in large part on the absence of any false statement in the Weide Email. Hsu reasoned that the deposition testimony did not support the inference or conclusion that the Weide Email was false as required for relevant liability under California law for disparagement or other defamation. (*Id.* at 4-5.) The Court finds it was reasonable for Hsu to rely on the Coverage Action order and for Hsu to look to California case law given that Judge Dorsey had relied on the same case law in her order. (*Id.* at 3; Ex. 180 at 9-10.)

54.      However, as noted in this Court's summary judgment order, Nautilus's interpretation that the evidence must clearly give rise to a potential claim for disparagement to trigger a duty to defend was ultimately unlawfully narrow. (ECF No. 315 at 33.) While a close call, the Court finds that this was a reasonable error given the reliance on the Coverage Action order.

55.      And while this Court ultimately found in its summary judgment order that Hsu was incorrect in determining there was no inference of falsity (*id.* at 23), the Court also finds that, given the subtle discrepancy, it was a reasonable error for Hsu to determine that the deposition testimony that Alphatec had "terminated" its contract with Switzer confirmed Weide's statement that a former distributor—Switzer—was "banned" from selling Alphatec product (Ex. 76 at 5).

56.      In addition, Hsu reasonably took into account her prior conversation with Switzer's counsel in which he asserted that Plaintiffs were not making a covered claim. (ECF No. 416 at 22-24.)

57.     The Court accordingly finds that Nautilus did not commit bad faith in denying coverage for the First Re-Tender because it conducted a reasonable—albeit erroneous—analysis and had reasonable bases for denial after it investigated the First Re-Tender.

### b.     Second Re-Tender: Voir Dire

58.     In evaluating the Second Re-Tender, Hsu investigated whether voir dire questions could trigger a duty to defend. Plaintiffs argue that Hsu specifically searched for cases where courts concluded that jury voir dire questioning did *not* trigger the duty to defend and therefore the evaluation was biased. (ECF No. 419 at 152.) However, Plaintiffs focus only on a portion of Hsu's testimony in a context in which she had first testified that she had searched for case law "about whether or not voir dire questioning would trigger a potential for coverage and a duty to defend." (ECF No. 416 at 27.) Finding no case law directly on point but relying on case law generally regarding the function of voir dire (*id.* at 27-28), Hsu reasonably informed Plaintiffs that statements made during Switzer's counsel's voir dire should not be equated as evidence or allegations made by Switzer (Ex. 80 at 1).

59.     Hsu additionally reasoned that even if voir dire could be considered as evidence of Switzer's allegations, the voir dire questions at issue do not meet the definition of a disparagement claim as defined by California law. (*Id.* at 1-2.) In reaching this analysis, Hsu again reasonably relied on California case law that the district court had relied on in the Coverage Action. (*Id.*) Moreover, by the time of the Second Re-Tender, the district court's order denying Plaintiffs' motion for relief from judgment had cast doubt on the likelihood that new evidence of deposition testimony from the First Re-Tender would trigger the duty to defend (Ex. 183 at 4-5), and this additional new "evidence" of voir dire questions from the Second Re-Tender likely reasonably did not appear to Nautilus as adding much new information to the First Re-Tender.

60.     The Court therefore finds that Nautilus had a reasonable basis for denying coverage for the Second Re-Tender and did not commit bad faith.

### c.     Third Re-Tender: Dixie Switzer's Testimony

61.     To investigate the Third Re-Tender, Hsu evaluated Dixie Switzer's trial testimony, in which she stated Switzer "continued to sell under Epsilon at Cottage Hospital . . . and we were not effectively banned." (Ex. 83 at 1.) In the denial letter, Hsu informed Plaintiffs that Dixie Switzer's testimony by itself did not meet the definition of disparagement under California law and that it did not explicitly refer to the Weide Email. (*Id.* at 2.) Hsu again reasonably relied on Judge Dorsey's rulings in the Coverage Action to the extent that they indicated the elements of disparagement under California law needed to be met to trigger a duty to defend. (*Id.* at 1.)

62.     However, the fact that the testimony did not explicitly reference the Weide Email does not absolve Nautilus of its knowledge that a previous communication it knew about stated the former distributor—Switzer—had been banned from selling product in California. Hsu reasoned that assuming the Weide Email is the statement referenced in Dixie Switzer's trial testimony, it is still not sufficient to trigger coverage because the Weide Email did not specifically name Switzer as the distributor in question. (*Id.* at 2.) But Nautilus knew or should have known by then that the Weide Email referred to Switzer, as noted in the pre-mediation report. (Ex. 124 at 2, 7; ECF No. 414 at 200.)

63.     Hsu testified that Judge Dorsey's rulings played a significant role in her analysis such that she might have evaluated the Third Re-Tender differently without those rulings. (ECF No. 416 at 34.) While it was reasonable for Hsu to rely on Judge Dorsey's rulings to some extent, Hsu also appeared to testify that Dixie Switzer's testimony did demonstrate that the Weide Email contained a false statement. (*Id.*) But she ultimately found that other elements of disparagement were not met (*id.* at 34-35), despite the fact that the Weide Email referred to Switzer's "product or business" and "derogated that product or business"—arguably satisfying those other elements identified in the denial letter (Ex. 83 at 1). This evinces at least a reckless disregard that Nautilus was acting unreasonably in its denial here. The Court therefore finds Nautilus committed bad faith in denying the Third Re-Tender.

### d.    Fourth Re-Tender: Weide and Switzer's Testimony

64.    As to the Fourth Re-Tender, Weide's trial testimony confirmed that she was referring to Ted Switzer as the distributor in her email, and Switzer's trial testimony indicated that he still "had the rights to sell [Alphatec] inventory." (ECF No. 404 at 10.) At that point, Nautilus knew or should have known that the Weide Email contained a false statement. However, in the denial letter, Hsu reasoned that this trial testimony was similar to the deposition testimony submitted with Plaintiffs' motion for relief from judgment (and with the First-Retender) that Judge Dorsey had indicated "probably does not trigger Nautilus's coverage" because "it remains unclear that the statements in the email are false and meet the other elements of slander or disparagement." (Ex. 88 at 3.) This trial testimony made fairly clear what Judge Dorsey had signaled was unclear about the Weide Email coupled with Switzer's deposition testimony, and therefore, it was unreasonable for Nautilus to overly rely on Judge Dorsey's rulings in this way and demonstrates again at least a reckless disregard that Nautilus was acting unreasonably. The Court finds that Nautilus committed bad faith in denying the Fourth Re-Tender.[10]

### 3.    Failure to Settle

65.    Plaintiffs also claim that Nautilus committed bad faith in not settling the Switzer Cross-Complaint within policy limits. The duty to defend includes "the insurer's right to control settlement discussions," which in turn "creates the duty of good faith and fair dealing during negotiations." *Miller*, 212 P.3d at 324-25.

66.    Plaintiffs argue that Nautilus rejected several opportunities to negotiate a settlement within its policy limits: (1) when it gave no settlement authority to defense counsel during the September 30, 2016 mediation; (2) when it received a letter from Phillips on July 28, 2017 indicating that the Switzer Action could be settled with a $600,000 to $800,000 contribution; and (3) when Phillips emailed coverage counsel on

---

[10]While Plaintiffs mention the Fifth Re-Tender in their proposed findings of facts in their post-trial brief (ECF No. 419 at 71), they do not raise arguments of bad faith specific to the denial of the Fifth Re-Tender (*see id.* at 154-55), so the Court need not and does not address the Fifth Re-Tender here.

1   August 4, 2017 that Switzer would accept $1 million in cash to settle the Switzer Action.

2   (ECF No. 419 at 32, 36, 38.)

3       67.    First, this Court previously found that Nautilus did not have a duty to attempt

4   to settle the Switzer action until there was a duty to defend, which was triggered on July

5   28, 2017. (ECF No. 315 at 38.) Nautilus therefore did not act unreasonably in not

6   providing settlement authority for the September 30, 2016 mediation because it did not

7   have a duty to defend at the time. Moreover, it had received and reasonably relied on

8   Judge Dorsey's ruling days before on September 27, 2016 that there was no duty to

9   defend. (ECF No. 404 at 8.)

10      68.    "Generally, '[a]n insurer who has no opportunity to settle within policy limits

11  is not liable for an excess judgment for failing to settle the claim.'" *Miller*, 212 P.3d at 328

12  (quoting 14 *Couch on Insurance* 3d § 203:18 (2005)). "Other courts have held that the

13  absence of a settlement offer within policy limits is not dispositive of the issue of the

14  insurer's good or bad faith, but just one of the factors in determining whether an insurer

15  acted in bad faith by failing to settle." *Id.* (quoting *Couch*, § 203:20).

16      69.    Agreeing with those other courts, the Nevada Supreme Court has held that

17  "an insurer can be liable for bad faith failure to settle even where a demand exceeds

18  policy limits if the insured is willing and able to pay the amount of the proposed settlement

19  that exceeds policy coverage." *Id.* at 329 (quoting *Couch*, § 203:20). "[I]f there is a

20  question of whether a settlement offer is within the policy limits or whether the insured

21  has the ability or willingness to contribute to the offer's excess, then the issues 'should be

22  resolved in favor of the insured, unless the insurer can show by affirmative evidence that

23  there was no realistic possibility for settlement within [policy] limits and that the insured

24  would not have made any contribution to a settlement above that amount.'" *Id.* at 328

25  (quoting *Couch*, § 203:18).[11]

26

27          [11]Both parties cite to this proposition. (ECF No. 419 at 168-69; ECF No. 420 at 41.)
    The Court notes that, based on the cases cited by this secondary source, this proposition
28  appears to refer to questions of fact at the summary judgment phase and how doubts
    should be resolved in favor of the insured and such questions should be sent to the

70. Here, as to the purported July 28, 2017 settlement opportunity, the Court found above that, from Hsu's and Nautilus's perspective, the $600,000 to $800,000 range raised by Phillips was based on Welke's recommendation as to settlement value in a pre-mediation report and that Welke had not conveyed a settlement opportunity in that range. (ECF No. 416 at 54-55.) This is also consistent with Welke's testimony that she does not recall discussing that settlement range from her pre-mediation report with Philips at any point. (ECF No. 415 at 30.) The Court therefore finds there was not a settlement opportunity within Policy limits on or around July 28, 2017.

71. As for the alleged August 4, 2017 settlement opportunity, the Court found above that Phillips's testimony that Switzer had made a settlement demand for $1 million is not credible. After Hsu investigated Phillips's email, Hsu learned instead that Plaintiffs themselves wanted to make a $1 million settlement offer and that the last settlement demand made by Switzer was $1.9 million. (ECF No. 416 at 55.) This is corroborated by Welke's Trial testimony that Switzer never conveyed to her a formal settlement demand of $1 million (ECF No. 415 at 72-73), by Wood's deposition testimony that the last formal settlement demand he received from Switzer was $1.9 million (Ex. 139 at 92-93), and by an August 9, 2017 claims note (Ex. 173 at 2.).

72. Accordingly, the evidence demonstrates that Nautilus never had a realistic possibility to settle within policy limits during the relevant timeframe, as Nautilus never received a formal settlement demand within $1 million. The evidence also demonstrates that Wood was willing and able to contribute $500,000 cash up front (ECF No. 414 at 128-29; ECF No. 415 at 190), and in fact, he was capped at that amount at the time according to Phillips (ECF No. 414 at 36). But given that the last and lowest formal settlement demand from Switzer was $1.9 million, Wood's contribution of $500,000 does not demonstrate that he was "willing and able to pay the amount of the proposed

---

factfinder where there is genuine dispute. *See Couch*, § 203:18 (citing cases). That is a different procedural posture than here, where the Court is acting as the factfinder and is resolving the questions of whether a settlement offer was within the policy limits and whether the insured was willing and able to pay the amount of a proposed settlement that exceeded policy limits.

settlement that exceed[ed] policy coverage"—which was $900,000. *See Miller*, 212 P.3d at 329. In other words, even with Plaintiffs' $500,000 contribution, that would leave $1.4 million, exceeding the Policy limits.

73.     Moreover, consistent with the Court's findings above that Nautilus did not commit bad faith in denying its duty to defend until the Third Re-Tender on September 19, 2017, it was also reasonable for Nautilus not to settle around July 28, 2017 and August 4, 2017 because at those times it reasonably believed there was no duty to defend based on its own investigations and Judge Dorsey's orders in the Coverage Action.

74.     In addition, it was further reasonable for Nautilus to not settle in these circumstances because Switzer's settlement demands were clearly based on damages for all 31 of his claims, not only any potentially covered damages arising out of the one claim for alleged interference with the Cottage Hospital relationship stemming from the Weide Email—of which Nautilus did not have evidence. (ECF No. 416 at 61.) And in considering settlement duties where some claims are indisputably not covered by the policy, some courts have found that "[an] insurer d[oes] not act in bad faith by refusing to settle non-covered third-party claims." *See Landow v. Med. Ins. Exch. of California*, 892 F. Supp. 239, 241 (D. Nev. 1995) (describing holding in *Camelot by the Bay Condo. Owners' Assn. v. Scottsdale Ins. Co.*, 27 Cal. App. 4th 33 (4th Dist. 1994)).

75.     The Court accordingly finds that Nautilus did not commit bad faith for failure to settle because Nautilus had reasonable bases for not settling the Switzer Action.

### 4.     Damages for Bad Faith Denial

76.     Having found that Nautilus committed bad faith in denying the Third and Fourth Re-Tenders, the Court now determines Plaintiffs' damages as a result. Plaintiffs argue they are entitled to compensatory, consequential, and punitive damages for Nautilus's bad faith conduct.

### a.     Compensatory Damages

77.     Plaintiffs argue that they are "entitled to an award for emotional distress, humiliation, inconvenience, and anxiety experienced and reasonably probable to be

experienced in the future" as compensatory damages. (ECF No. 419 at 181-82.) But Plaintiffs appear to only argue that Nautilus's refusal to settle caused these purported damages. (*Id.* at 182-83.) Plaintiffs do not tie their request for emotional distress damages specifically to Nautilus's denial of the Re-Tenders, let alone to the Third and Fourth Re-Tenders in particular.

78.     Moreover, Plaintiffs merely cite to Wood's Trial testimony about the emotional and mental impact of the Switzer Action *verdict* on him. (*Id.* at 183; ECF No. 414 at 130-32.) For similar reasons discussed above regarding the damages caused by the breach of the contractual duty to defend, the bad faith denial of the Third and Fourth Re-Tenders did not cause the Switzer Action verdict, as Gordon Rees continued to zealously defend Plaintiffs despite Nautilus's continued refusal to defend and pay for the defense. And Plaintiffs' request for an award of "no less than [the] total interest that has accrued on the Switzer judgment"—almost $4 million—is simply not reasonably tied to emotional distress damages caused by Nautilus's refusal to defend based on the Third and Fourth Re-Tenders. (ECF No. 419 at 183.)

79.     The Court accordingly finds that Plaintiffs have not met their burden to demonstrate emotional distress damages resulting from Nautilus's bad faith denial of the Third and Fourth Re-Tenders.

### b.     Consequential Damages

80.     Nevada law "allows recovery of consequential damages where there has been a showing of bad faith by the insurer." *U. S. Fid. & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975). "The test for consequential damages is . . . whether the injured party's harm was reasonably foreseeable at the time the contract was formed." *My Left Foot Children's Therapy, LLC v. Certain Underwriters at Lloyd's London subscribing to Pol'y No. HAH15-0632*, Case No. 2:15-cv-01746-MMD-VCF, 2021 WL 1093094, at *6 (D. Nev. Mar. 22, 2021). "[F]oreseeability requires that: (1) damages for loss must 'fairly and reasonably be considered [as] arising naturally . . . from such breach of contract itself,' and (2) the loss must be 'such as may reasonably be supposed to have been in the

contemplation of both parties, at the time they made the contract as the probable result of the breach of it.'" *Clark Cnty. Sch. Dist. v. Rolling Plains Const., Inc.*, 16 P.3d 1079, 1082 (Nev. 2001), *disapproved of on other grounds by Sandy Valley*, 35 P.3d 964.

81.     Plaintiffs broadly and in conclusory fashion argue that they are entitled to consequential damages for Nautilus's bad faith consisting of the amount of the Switzer Action jury verdict award of $9,818,761.50 and interest accruing at $2,690.00 per day since it was entered on September 12, 2019. (ECF No. 419 at 185.) It is unclear whether Plaintiffs are arguing that Nautilus's bad faith as a whole or only its failure to settle resulted in the jury verdict amount against Plaintiffs. (*Id.* at 185.) Plaintiffs again do not clearly tie their request for consequential damages to Nautilus's denial of Re-Tenders. And while a jury verdict award against Plaintiffs that exceeded the Policy limits "may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract" *in general*, Plaintiffs have not demonstrated that the jury verdict award is "fairly and reasonably considered as arising naturally" from the specific breach of Nautilus's implied duty of good faith and fair dealing with respect to the Third and Fourth Re-Tenders. *See Rolling Plains Const.*, 16 P.3d at 1082.

82.     The Court therefore finds that Plaintiffs have not met their burden to establish consequential damages with a reasonable certainty resulting from Nautilus's bad faith denial of the Third and Fourth Re-Tenders. *See McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) ("As a general rule, damages which result from a tort must be established with reasonable certainty.").

83.     In addition, Plaintiffs argue that they are entitled to attorney's fees and costs for this instant action as consequential damages (ECF No. 419 at 185.) For similar reasons discussed above as to the breach of contract claim, the Court finds that Plaintiffs have not met their burden to show that an award of attorneys' fees here is authorized by statute, rule, or agreement or that they meet an exception to the general rule for their bad faith claim. *See Pardee Homes*, 444 P.3d at 426.

1

### c.    Punitive Damages

2    84.    Nevada law provides that punitive damages may be awarded for bad faith

3  claims. *Guar. Nat. Ins. Co. v. Potter*, 912 P.2d 267, 273 (Nev. 1996) (citing NRS § 42.005).

4  "Nevada follows the rule that proof of bad faith, by itself, does not establish liability for

5  punitive damages." *United Fire Ins. Co. v. McClelland*, 780 P.2d 193, 198 (Nev. 1989)

6  (citation omitted). To prevail on a claim for punitive damages, an insured must prove "by

7  clear and convincing evidence" that the insurer "has been guilty of oppression, fraud or

8  malice, express or implied." NRS § 42.005(1); *Potter*, 912 P.2d at 273.

9    85.    "[C]lear and convincing evidence must be 'satisfactory' proof that is 'so

10  strong and cogent as to satisfy the mind and conscience of a common man, and so to

11  convince him that he would venture to act upon that conviction in matters of the highest

12  concern and importance to his own interest. It need not possess such a degree of force

13  as to be irresistible, but there must be evidence of tangible facts from which a legitimate

14  inference . . . may be drawn.'" *In re Discipline of Drakulich*, 908 P.2d 709, 715 (Nev. 1995).

15    86.    "The common law definitions of oppression, fraud, and malice apply in bad

16  faith [insurance] suits." *Polymer Plastics Corp. v. Hartford Cas. Ins. Co.*, 389 F. App'x

17  703, 707 (9th Cir. 2010) (citing NRS § 42.005(5)). Oppression is defined as "a conscious

18  disregard for the rights of others which constitutes an act of subjecting plaintiffs to cruel

19  and unjust hardship." *McClelland*, 780 P.2d at 198. Common law fraud requires the

20  following elements: "(1) a misrepresentation made by the defendant; (2) defendant's

21  knowledge of the misrepresentation; (3) defendant's intent to defraud the plaintiff

22  (scienter); (4) reliance by the plaintiff; and (5) resulting damage to the plaintiff from such

23  reliance." *Sec'y of State v. Tretiak*, 22 P.3d 1134, 1139 n.14 (Nev. 2001). "Malice refers

24  to conduct which is intended to injure a person or despicable 'conduct which is engaged

25  in with a conscious disregard of the rights or safety of others.'" *Polymer*, 395 F. App'x at

26  707 (noting that NRS 42.001(3) applies because it codified the common law definition of

27  malice).

28

87. Plaintiffs appear to largely rely on the same arguments for bad faith as for punitive damages (ECF No. 419 at 188) and therefore do not meet their burden to show by clear and convincing evidence that Nautilus has been guilty of oppression, fraud or malice. Moreover, as Plaintiffs acknowledge (*id.* at 186), the imposition of punitive damages is only justified when the defendant's conduct "exceed[s] 'mere recklessness or gross negligence.'" *Wyeth v. Rowatt*, 244 P.3d 765, 783 (Nev. 2010). The Court finds that Nautilus's bad faith denial of the Third and Fourth Re-Tenders constitutes "mere recklessness" and does not rise to the level of oppression, fraud, or malice to warrant punitive damages.

### C. Unfair Claims Practices

88. Plaintiffs claim that Nautilus violated several provisions of NRS § 686A.310, Nevada's Unfair Claims Practices Act. (ECF No. 419 at 120-21.)

### 1. Misrepresentation of Pertinent Facts

89. Plaintiffs first allege that Nautilus violated NRS § 686A.310(1)(a), which considers "[m]isrepresenting to insureds or claimants pertinent facts or insurance policy provisions relating to any coverage at issue" to be an "unfair practice." NRS § 686A.310(1)(a). "This subsection prohibits such malfeasance as an insurer misrepresenting the terms of an insurance policy to its insured, or misrepresenting to its insured facts that are within the insurer's knowledge that could give rise to coverage." *Zurich American Ins. Co. v. Coeur Rochester, Inc.*, 720 F. Supp. 2d 1223, 1236 (D. Nev. 2010) (citing *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 961 (Nev. 1998) and *Stalberg v. W. Title Ins. Co.*, 230 Cal. App. 3d 1223 (6th Dist. 1991)).

90. Plaintiffs allege that Nautilus violated this subsection by misrepresenting: (1) in a July 26, 2017 letter that there was no potential coverage while Nautilus was still assessing whether there was potential coverage based on Plaintiffs' First Re-Tender; (2) the applicable law as it related to the meaning of the undefined Policy terms; (3) that it intended to defend Plaintiffs through the reconsideration motion and appeal (if any) in the Coverage Action in its November 7, 2016 letter; (4) the applicable law about paying

1  Plaintiffs' independent counsel; and (5) the law about bad faith depending on the duty to

2  defend. (ECF No. 419 at 123-26.)

3      91.   As explained below, the Court finds that none of these constitute

4  "misrepresentations" under NRS 686A.310(1)(a).

5      92.   Plaintiffs' first argument fails because Nautilus's statement that "there is no

6  potential for coverage for [Plaintiffs'] claim under the policy" was not a statement of fact

7  but rather a statement of legal opinion by its coverage counsel. (Ex. 169 at 2.) *See also*

8  *Arlitz v. GEICO Cas. Co.*, 642 F. Supp. 3d 1214, 1242-43 (D. Nev. 2022) (finding that a

9  statement of no coverage under an insurance policy was not a misrepresentation of

10  pertinent facts or policy provisions, but an "interpretation that accords with one potential

11  view of the policy"). Moreover, Plaintiffs did not submit the First Re-Tender until July 28,

12  2017, so Nautilus's position that it believed there was no potential for coverage as of July

13  26, 2017 is not inconsistent with the fact that Nautilus later re-assessed whether there

14  was potential coverage upon receiving the First Re-Tender.

15      93.   Plaintiffs' second and fourth arguments also fail because Nautilus's

16  statements as to the law applicable to defining Policy terms and paying independent

17  counsel are not misrepresentations of "pertinent facts" relating to coverage, but rather

18  Nautilus's analysis of the Policy and the applicable law. *See Zurich*, 720 F. Supp. 2d at

19  1236-37 (finding that an insurer's "analysis of the Policy and the facts pertinent to [the

20  insured]'s claim" are "not misrepresentations of the terms of the Policy or of pertinent facts

21  relating to coverage"). Nautilus reasonably relied on California law to interpret the Policy

22  terms given that the Coverage Action court agreed with the parties that California law

23  applied to the tortious conduct alleged in the Switzer Action. (Ex. 180 at 9.) Moreover, the

24  Ninth Circuit, upholding the district court's coverage denial, stated that "[b]ecause the

25  allegations in the underlying action stem from an injury that occurred in California,

26  California law governs the rights and liabilities of the parties as it pertains to Nautilus's

27  duty to defend." *Nautilus Ins. Co. v. Access Med., LLC*, 780 F. App'x 457, 459 (9th Cir.

28  2019). It was also reasonable for Nautilus to look to California law regarding independent

counsel because Nevada's independent counsel rules are expressly derived from California's *Cumis* rule. *See Hansen*, 357 P.3d at 341.

94.     Plaintiffs' fifth argument is similarly unpersuasive. Nautilus's statement that there can be no bad faith because there was no duty to defend is not a misrepresentation of "pertinent facts" or policy provisions relating to coverage. This was Nautilus's analysis of the law, not a fact regarding coverage or a policy provision.

95.     Lastly, while Nautilus did appear to renege on its promise to defend Plaintiffs under a reservation of rights through appeal in its November 7, 2016 letter, the Court is ultimately not persuaded that such a "broken promise" constitutes a misrepresentation of pertinent facts relating to coverage. The promise was a statement of Nautilus's intentions at the time and is not the type of statement that courts have found violate this subsection. *See, e.g.*, *Albert H. Wohlers*, 969 P.2d at 961 (insurer misrepresented to the insured that a policy was similar to the insured's previous policy and unilaterally inserted provisions into the policy without disclosing their effect to the insured); *Stalberg*, 230 Cal. App. 3d at 1234 (under similar provision of California law, finding substantial evidence of violation where insurer created and recorded "wild" deeds containing fictitious easements, and concealed this fact from its insureds). In addition, Nautilus's reservation of rights letters continued to notify Plaintiffs that Nautilus reserved its right to withdraw its defense of Plaintiffs in the Switzer Action.

96.     The Court therefore finds that Nautilus did not violate NRS § 686A.310(1)(a).

### 2.     Failing to Acknowledge or Act Reasonably Promptly to Communications

97.     Plaintiffs assert that Nautilus violated NRS § 686A.310(1)(b), which considers "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies" to be an "unfair practice." NRS § 686A.310(1)(b).

98.     Plaintiffs argue that Nautilus did not acknowledge and act reasonably promptly upon communications regarding its duty to defend Plaintiffs in the Switzer Action arising under the Policy, specifically regarding the Weide Email, the pre-mediation evaluation report, and a deposition schedule. (ECF No. 419 at 127.) First, the Court notes that these specific arguments were improperly raised for the first time under NRS § 686A.310(1)(b) in Plaintiffs' post-trial briefing. (*Id.*) They were not raised in Plaintiffs' pre-trial briefing (*see* ECF No. 399 at 89-93) nor prior briefing (*see* ECF No. 301 at 30) sufficient to give Nautilus notice to address them. The Court therefore need not consider these arguments.

99.     Even if the Court were to consider these arguments, they are largely unpersuasive because this subsection addresses insurer's responses to "claims" by insureds, and Plaintiffs fail to demonstrate that these purported communications of the Weide Email, pre-mediation evaluation report, and deposition schedule are "claims" in and of themselves. *See Young v. Mercury Cas. Co.*, Case No. 2:12-cv-00091-RFB-GWF, 2016 WL 4083217, at *6 (D. Nev. July 29, 2016) (referring to a reasonable time period for investigation of an insurance claim of "within 30 days after receiving notice of the claim" when interpreting NRS § 686A.310(1)(b)). Moreover, Plaintiffs argue that Nautilus never contacted its defense counsel to request additional information about the content of the Weide Email, pre-mediation evaluation report, or depositions, but Plaintiffs fail to establish how this subsection obligates such courses of action and the Court has already found that Nautilus's corresponding investigations were reasonable.

100.    The Court therefore finds that Nautilus did not violate NRS § 686A.310(1)(b).

### 3.     Failing to Implement Reasonable Investigation Standards

101.    Plaintiffs allege that Nautilus violated NRS § 686A.310(1)(c), which considers "[f]ailing to adopt and implement reasonable standards for prompt investigation and processing of claims arising under insurance policies" to be an "unfair practice." NRS § 686A.310(1)(c).

102.    Plaintiffs argue that Nautilus violated this subsection by: (1) shifting the burden to investigate its duty to defend arising under its Policy onto Plaintiffs; and (2) adopting a protocol that permitted coverage counsel to deny coverage based on an overly restrictive interpretation of undefined Policy terms. (ECF No. 419 at 129.)

103.    As to the first argument, Plaintiffs assert that instead of proactively investigating new evidence from the Re-Tenders, Nautilus denied each Re-Tender and invited additional information. (*Id.*) But insurers may encourage policyholders to provide them with information without abrogating their duties to investigate the claims. Here, Nautilus's invitations that Plaintiffs forward any new information that may trigger coverage does not in itself impermissibly shift the burden onto Plaintiffs. Rather, this invitation shows Nautilus's willingness to investigate any new information that may trigger coverage.

104.    Plaintiffs relatedly claim that Nautilus failed to investigate anything beyond the information that Plaintiffs provided. To the extent this subsection may apply to how investigations were conducted as opposed to whether reasonable investigation standards were in place, as the Court found above regarding Plaintiffs' bad faith claims, Nautilus's investigations of each Re-Tender were reasonable, despite the fact that its denials and conclusions from its investigations of the Third and Fourth Re-Tenders were ultimately unreasonable.

105.    As to the second argument, Plaintiffs assert that Nautilus agreed that the undefined terms in the Policy should be understood by their common everyday meaning but repeatedly approved of coverage counsel's applications of "an overly restrictive interpretation" of the terms under California law. (ECF No. 419 at 130-31.) However, Plaintiffs rest their argument largely on deposition testimony from December 21, 2020 of a Nautilus claims handler who tepidly and generally agreed to that understanding. (Ex. 116 at 18, 63.) Nautilus denied the Re-Tenders back in 2017, so this 2020 deposition testimony is too attenuated in time (and substance) to demonstrate that Nautilus contravened some sort of agreed-upon understanding of how to interpret undefined Policy

terms. Moreover, as discussed above, Nautilus was not wholly unreasonable in applying California law to interpret the terms given that Judge Dorsey's Coverage Action rulings cited to similar California law.

106.    The Court therefore finds that Nautilus did not violate NRS § 686A.310(1)(c).

### 4.    Failing to Timely Affirm or Deny Coverage

107.    Plaintiffs assert that Nautilus violated NRS § 686A.310(1)(d), which considers "[f]ailing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured" to be an "unfair practice." NRS § 686A.310(1)(d).

108.    Plaintiffs argue that Nautilus violated this subsection because it: (1) did not promptly communicate its decision to withdraw litigation funding, given the original jury trial date; (2) did not promptly communicate its coverage determination regarding the First Re-Tender before withdrawing litigation funding; and (3) failed to communicate its decision to deny the Re-Tenders based on Altounian's 2014 phone call to coverage counsel. (ECF No. 419 at 132-34.)

109.    To the extent Plaintiffs are arguing that Nautilus's notifying of Plaintiffs on July 6, 2017 that it was withdrawing the defense on August 1, 2017 was untimely given that trial was scheduled to originally begin on August 14, 2017, that argument fails. A violation of NRS § 686A.310(1)(d) requires failing to timely affirm or deny coverage, which has nothing to do with Nautilus's withdrawal of defense under a reservation of rights. Nautilus made clear throughout that it denied coverage under the Policy.

110.    Next, Plaintiffs' latter two arguments are improperly raised for the first time in Plaintiffs' post-trial briefing. (*Compare* ECF No. 419 at 132-34 *with* ECF No. 399 at 100-01.) In any event, the Court finds both arguments unpersuasive. First, Plaintiffs have not demonstrated that Nautilus's denial of the First Re-Tender on August 10, 2017—only 13 days after it was submitted—was untimely. (ECF No. 404 at 9.) Nautilus need not have necessarily communicated a denial of the First Re-Tender before withdrawing its defense

1   for it to be timely. Second, a violation of NRS § 686A.310(1)(d) requires failing to timely

2   affirm or deny coverage, not merely failing to provide one of the bases for a denial.

3       111.   The Court therefore finds that Nautilus did not violate NRS §

4   686A.310(1)(d).

### 5. Failing to Promptly Settle When Liability is Clear

6       112.   Plaintiffs assert that Nautilus violated NRS § 686A.310(1)(e), which

7   considers "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which

8   liability of the insurer has become reasonably clear" to be an "unfair practice." NRS §

9   686A.310(1)(e).

10       113.   Plaintiffs argue that Nautilus rejected multiple settlement opportunities

11   between September 30, 2016 and August 4, 2017 (ECF No. 419 at 136.) As discussed

12   above regarding Plaintiffs' bad faith claims for failure to settle and for denial of the First

13   and Second Re-Tenders, the Court finds that Nautilus acted reasonably in not settling

14   during that time frame and Plaintiffs have also failed to demonstrate that Nautilus's liability

15   was "reasonably clear" during that time. The Court therefore finds that Nautilus did not

16   violate NRS § 686A.310(1)(e).

### 6. Compelling Insureds to Litigate for Benefits Owed

18       114.   Plaintiffs finally assert that Nautilus violated NRS § 686A.310(1)(f), which

19   considers "[c]ompelling insureds to institute litigation to recover amounts due under an

20   insurance policy by offering substantially less than the amounts ultimately recovered in

21   actions brought by such insureds, when the insureds have made claims for amounts

22   reasonably similar to the amounts ultimately recovered" to be an "unfair practice." NRS §

23   686A.310(1)(f).

24       115.   The Court finds that NRS § 686A.310(1)(f) does not apply here. Even

25   assuming that failing to defend despite a duty to do so constitutes "[c]ompelling insureds

26   to institute litigation to recover amounts due under an insurance policy," Plaintiffs have

27   failed to demonstrate any "amounts ultimately recovered."

28

116.    Plaintiffs prematurely argue that based on the determination that Nautilus owed a duty to defend, to pay reasonable costs of independent counsel, and to engage in fair settlement negotiations, Plaintiffs have "ultimately recovered" the amount of their defense in the underlying case, the reasonable remaining fees for independent counsel, and the resulting judgment in the Switzer Action. (ECF No. 419 at 140.) But even assuming the Court has awarded Plaintiffs some of the recovery they seek in this order, the Court is not persuaded that Plaintiffs may bring a viable claim for violation of NRS § 686A.310(1)(f) at the same time as it seeks recovery of amounts that could potentially constitute "amounts ultimately recovered" for purposes of NRS § 686A.310(1)(f).

117.    To support their argument, Plaintiffs cite only to *Young v. Mercury Casualty Co.*, Case No. 2:12-cv-00091-RFB-GWF, 2016 WL 4083217, at *7 (D. Nev. July 29, 2016). Plaintiffs' situation is unlike *Young*, where the court found a violation of NRS § 686A.310(1)(f) where the insured had demanded the full amount of the policy, the insurer offered no amount at all to settle the claim, and the insured ultimately received the full amount of the policy from the insurer following arbitration. *See* 2016 WL 4083217, at *7. The "amounts ultimately recovered" in *Young* were recovered before the insured brought their NRS § 686A.310(1)(f) claim. Plaintiffs' argument here amounts to "putting the cart before the horse." Even if such an argument were plausible, Plaintiffs have not met their burden to prove that Nautilus more likely than not committed a violation of NRS § 686A.310(1)(f).

118.    The Court therefore finds that Nautilus did not violate NRS § 686A.310(1)(f).

**D.    Nautilus's Unjust Enrichment Counterclaim**

119.    Nautilus asserts a counterclaim against Plaintiffs for unjust enrichment, seeking reimbursement of the defense costs, including attorneys' fees and other costs, that Nautilus expended on behalf of Plaintiffs in the Switzer Action when it had no duty to defend them.[12] (ECF No. 167 at 24.) Nautilus argues that it is entitled to damages on its

---

[12]Nautilus did not pursue its counterclaims for equitable estoppel and equitable subrogation at the Trial. (ECF No. 420 at 49.)

counterclaim for unjust enrichment in the total amount of $829,537.36 against Plaintiffs, representing defense costs Nautilus paid from February 25, 2015 to July 27, 2017 on behalf of Plaintiffs in the Switzer Action. (ECF No. 420 at 49.)

120.    The Nevada Supreme Court held in *Nautilus*, 482 P.3d at 691-92, that under principles of unjust enrichment and restitution, an insurer is entitled to reimbursement when: (1) "a court determines that an insurer never owed a duty to defend"; (2) "the insurer expressly reserved its right to seek reimbursement in writing after defense was tendered"; and (3) "the policyholder accepted the defense from the insurer."

121.    Nautilus argues that the Ninth Circuit in the Coverage Action appeal recognized that whether an insurer's duty to defend may be triggered at a later time based on new evidence does not undermine the Nevada Supreme Court's rationale that an insurer may obtain reimbursement of defense costs paid when the policy did not require that the insurer pay in the first instance because there was no duty to defend at the time of incurring the expense. (ECF No. 420 at 50.) But this is not an accurate reading. The Ninth Circuit merely noted in a footnote that "[t]hat Nautilus may owe a duty to defend the [insureds] in the future is not before [the court]." *Nautilus*, 2021 WL 3485911, at *1 n.1.

122.    Plaintiffs counter that Nautilus is not entitled to any reimbursement because this Court has determined that there was a duty to defend. (ECF No. 419 at 193.) The Court agrees with Plaintiffs. Nautilus may have satisfied all three conditions in the Coverage Action, as the Ninth Circuit found on August 9, 2021, *Nautilus*, 2021 WL 3485911, at *1, but Nautilus cannot now satisfy the first condition here, where this Court found on March 22, 2022 that Nautilus owed a duty to defend (ECF No. 315 at 22-23).

123.    While this Court found the duty to defend was triggered on July 28, 2017, to find that Nautilus is entitled to reimbursement of defense costs before that triggering date would go against the Nevada Supreme Court's rationale of "giv[ing] effect to the parties' agreement" whereby the insured paid premiums for a defense of potentially covered claims. *See Nautilus*, 482 P.3d at 691-92. Simply because it took a re-tender as opposed to the initial tender to trigger the duty to defend does not mean that Plaintiffs

52

were unjustly enriched by Nautilus's payment of defense costs between February 25, 2015 to July 27, 2017, where Nautilus ultimately became contractually obligated to furnish a defense.

124.    The Court therefore finds that Nautilus is not entitled to reimbursement of its claimed defense costs expended between February 25, 2015 to July 27, 2017.

### E.    Pre- and Post-Judgment Interest

125.    In sum, Plaintiffs are awarded $101,727.30 for the reasonable expert fees Plaintiffs incurred after August 1, 2017 for the breach of the contractual duty to defend claim and awarded $120,045.85 for the breach of the contractual duty to pay reasonable costs to independent counsel claim. This totals to $221,773.15. No other damages are awarded as discussed above. As explained below, the Court finds that Plaintiffs are entitled to pre-judgment and post-judgment interest.

126.    "The recognized general rule is that state law determines the rate of prejudgment interest in diversity actions." *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). On the other hand, federal law determines post-judgment interest even in diversity cases. *Id.*

127.    Under Nevada law, "[t]hree items must be determined to enable the trial court to make an appropriate award of interest: (1) the rate of interest; (2) the time when it commences to run; and (3) the amount of money to which the rate of interest must be applied." *Kerala Properties, Inc. v. Familian*, 137 P.3d 1146, 1148-49 (Nev. 2006).

128.    NRS § 17.130 provides, in relevant part:

> When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied . . . at a rate equal to the prime rate at the largest bank in Nevada as ascertained by the Commissioner of Financial Institutions on January 1 or July 1, as the case may be, immediately preceding the date of judgment, plus 2 percent.

129.    Nautilus was served with the summons and complaint in this case on August 25, 2017. (ECF No. 1 at 2; ECF No. 15 at 1.) Therefore, under NRS 17.130, pre-

judgment interest began to accrue on August 25, 2017 and runs through the date of this order (for a total of 2306 days).

130.    Nevada's prime rate as of July 1, 2023 is 8.25%. *See* State of Nevada, Department of Business & Industry, Financial Institutions' Prime Interest Rate Sheet, available at https://fid.nv.gov/Resources/Fees_and_Prime_Interest_Rate/ (last visited December 18, 2023). Under NRS § 17.130, two percent is added to the prime rate, so the appropriate pre-judgment interest rate here is 10.25% per year. Applying this interest rate to Plaintiffs' total award of $221,773.15 amounts to $143,614.82 in pre-judgment interest.

131.    Post-judgment interest is available under 28 U.S.C. § 1961.

132.    Accordingly, Plaintiffs are awarded a total of $365,387.97, along with post-judgment interest accruing until the amount is paid in full.

## V.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not materially affect the outcome of this case.

It is therefore ordered that Plaintiffs' motion to amend the complaint (ECF No. 421) is denied.

It is further ordered that Plaintiffs' motion to amend the summary judgment order (ECF No. 422) is denied.

It is further ordered that Nautilus mostly prevails—as specified herein—regarding damages for the claim for breach of the contractual duty to defend.

It is further ordered that Plaintiffs prevail—as specified herein—on the claim for breach of the contractual duty to pay reasonable costs of independent counsel.

It is further ordered that Plaintiffs prevail in part and Nautilus prevails in part—as specified herein—on the claims for bad faith, but Plaintiffs failed to demonstrate damages as specified herein.

It is further ordered that Nautilus prevails—as specified herein—on the claims arising under the Nevada Unfair Claims Practices Act.

It is further ordered that Plaintiffs prevail—as specified herein—on Nautilus's counterclaim for unjust enrichment.

It is further ordered that Plaintiffs are awarded a total of $365,387.97 in damages and pre-judgment interest—as specified herein—along with post-judgment interest accruing until the amount is paid in full.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 18th Day of December 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE